FOULKE LAW FIRM
*As of Counsel to Attorney Frederick C. Kelly*
*Attorneys for Plaintiff*
577 Eder Avenue
Wyckoff, NJ  07481
(877) 368-5535
-------------------------------------------------------X

JASON JORJANI,

                    Plaintiff,

-vs-

NEW JERSEY INSTITUTE OF TECHNOLOGY,
JOEL S. BLOOM, KEVIN J. BELFIELD,
GARETH J. RUSSELL, ANDREW KLOBUCAR,
and NEIL J. MAHER,

                    Defendants.
-------------------------------------------------------X

Docket No. 18-CV-11693

**COMPLAINT**
(Demands Trial by Jury)

Plaintiff alleges the following:

1.      This is a civil action seeking damages against defendants for committing acts under color of law that deprive plaintiff of rights secured to him under the Constitution and the laws of the United States, for retaliating against plaintiff for the exercise of the First Amendment rights of freedom of speech and association, and for defaming plaintiff.

JURISDICTION & VENUE

2.      This court has jurisdiction of this action pursuant to §§ 1331 & 1343 of Title 28 of the United States Code, and § 1983 of Title 42 of the United States Code; and diversity jurisdiction of the state law claims pursuant to 28 USC § 1332.

3.      Venue is properly laid in this court under the provisions of 28 USC § 1391(b)(2) by

reason of the fact that a substantial part of the events or omissions giving rise to the

claims herein occurred within the district.

PARTIES

4.      Plaintiff Jason Jorjani is a citizen and resident of New York, New York, and of the

United States of America.  He is and at all relevant times was a governmental employee

of the Defendant New Jersey Institute of Technology; however, his contract has been

refused renewal beyond the current academic year.

5.      Defendant New Jersey Institute of Technology, (hereafter, "NJIT") is a public university

with offices and a campus at University Heights, Newark, New Jersey.  NJIT is

organized and existing under the laws of the State of New Jersey and is a public

corporate entity of the State of New Jersey, established by NJ 18A:64E-14.

6.      NJIT is governed by a Board of Trustees per N.J.S.A. 18A:64E-18.

    a.      Per subsection (b) of N.J.S.A. 18A:64E-18, said Board of Trustees has final

        authority to determine policies for the organization, administration and

        development of NJIT.

    b.      Per subsection (i) of N.J.S.A. 18A:64E-18, said Board of Trustees has final

        authority to determine controversies and disputes concerning tenure, personnel

        matters and other issues involving the university arising under Title 18A of the

        New Jersey Statutes.

    c.      Per subsection (o) of N.J.S.A. 18A:64E-18, said Board of Trustees has authority to adopt bylaws and amend the same.

    d.      Accordingly, the Board of Trustees has, and at all relevant times had, policymaking authority for NJIT rendering its behavior an act of official government policy for liability purposes.  Furthermore, the Board of Trustees is, and at all

relevant times was, an official body with authority to ratify the unconstitutional actions of a subordinate – to wit, Defendant Bloom – rendering such behavior official for liability purposes.

7.    Defendant Joel S. Bloom is, and at all relevant times was, the President of NJIT and an employee of NJIT.  Upon information and belief, Defendant Bloom is a resident of the State of New Jersey.

    a.      Per subsection (h) of N.J.S.A. 18A:64E-18, Defendant Bloom is, and at all relevant times was, charged with nominating or recommending the appointment, removal, promotion and transfer all other officers, agents, or employees of NJIT to the Board of Trustees.

    b.      Per NJIT Bylaws Article III, §1, Defendant Bloom is, and at all relevant times was, the chief executive officer of the Board of Trustees of NJIT.

    c.      Furthermore, per NJIT Bylaws Article III, §2 (D), Defendant Bloom is, and at all relevant times was, charged with the duty to execute and make effective the policies, orders, decisions and other acts of the Board of Trustees; and, upon

- 3 -

information and belief, pursuant to the same subsection, Defendant Bloom was delegated authority by the Board of Trustees or its Chairman to make decisions or recommendations bearing on the investigation, suspension, hiring, and firing of NJIT's faculty.

d.   As such, Defendant Bloom is a subordinate of the Board of Trustees.  In the alternative, Defendant Bloom is a final policy maker in his own right  rendering his behavior an act of official government policy.

8.   Defendant Dean Kevin J. Belfield is, and at all relevant times was, the Dean of the College of Science and Liberal Arts at NJIT and an employee of NJIT.  Upon information and belief, Defendant Belfield is a resident of the State of New Jersey.

9.   Defendant Gareth J. Russell is, and at all relevant times was, a Professor at NJIT and Chair of the Biology Department; and an employee of NJIT.  Upon information and belief, Defendant Russell is a resident of the State of New Jersey.

10.   Defendant Andrew Klobucar is, and at all relevant times was, a Professor at NJIT and President of the Faculty Senate; and an employee of NJIT.  Upon information and belief, Defendant Klobucar is a resident of the State of New Jersey.

11.   Defendant Neil J. Maher is, and at all relevant times was, a Professor at NJIT and Chairman of Federated Department of History at New Jersey Institute; and an employee of NJIT.  Upon information and belief, Defendant Maher is a resident of the State of New Jersey.

STATEMENT OF FACT

12.    Plaintiff received a doctorate in philosophy from the State University of New York at Stony Brook in 2013.

13.    Plaintiff was hired as a full time lecturer in the Philosophy Department by Defendant NJIT through action by the Board of Trustees in the late Spring or early Summer of 2015 and began teaching at NJIT in the Fall of 2015.

14.    His contract was renewed by the Board of Trustees in the Spring of 2016 and again in the Spring of 2017.  Plaintiff taught at NJIT in the 2015–2016 academic year and in the 2016-2017 academic year.  In both of those academic years, Plaintiff received student and employee evaluations reflecting above average performance as a professor.

15.    As set forth below, due to the actions of Defendants, Plaintiff's duties were interrupted at the start of the 2017–2018 academic year.

16.    NJIT has accepted the mandate of academic freedom as an important part of the common good.

17.    NJIT has assented to the proposition that academic freedom, in the context of the common good, "depends upon the free search for truth and its free exposition." Moreover, the NJIT has taken the position that it is the "antithesis of academic freedom" to engage in acts "which in effect deny freedom of speech, [and] the freedom to be heard."  In particular, NJIT has committed itself to the proposition that when a college or university teacher – which Plaintiff undoubtedly was at all relevant times herein – speaks or writes as a citizen, he should be free from institutional censorship or discipline.

- 5 -

18.    Yet as shown herein, Defendants violated Plaintiff's academic freedom with gross hypocrisy; stifled Plaintiff's free search for truth; retaliated against Plaintiff for the exercise of free speech; and subjected Plaintiff to institutional censorship and discipline for speaking and writing as a citizen.

19.    In the summer of 2017, while off campus and not working on his employer's time, Plaintiff was surreptitiously taped speaking about matters of public concern in a pub in New York City.

20.    The organization that had put Plaintiff under surveillance and surreptitiously taped him is known as "Hope Not Hate." It is a self appointed ideological watchdog organization, with a stated aim of "deconstructing" those whom it disapproves and denigrates as "fascist" or "extremist." To this end, "Hope Not Hate" undertakes intellectual witch hunts.

21.    Said self appointed ideological watchdog accomplishes its ends by spying on people and lying to those it targets for having impure thoughts. The self appointed ideological watchdog euphemistically refers to this process of deception as "infiltration" and going "undercover." Thus, in Plaintiff's case the self appointed ideological watchdog sent a man named Patrik Hermansson to falsely pass himself off as a graduate student called "Erik Hellberg" who was pursuing research into how the Left persecutes and silences Right wing thought in academia[1]. Under such false (and ironic) pretense, this

---

[1] The New York Times Op -Ed referenced *infra*. is in accord, stating that Hermansson was "Posing as a student writing a thesis about the suppression of right-wing speech..."

Hermansson gained the confidence of Plaintiff and convinced Plaintiff to meet and speak with him at a pub in New York City.

22.    Hermansson then secretly video taped the conversation, which lasted for several hours and covered a wide range of subjects, some of which are confined by powerful contemporary taboos, as the subject of race is so confined.  The conversation unquestionably touched on matters of public concern because it dealt with, among other things, race, immigration into the West, and politics.

23.    Part of this hours long conversation – surreptitiously obtained and recorded – ended up embedded in a "New York Times" Op - Ed on September 19, 2017.

24.    However, the snippet of conversation that ended up embedded in said "New York Times" Op - Ed on September 19, 2017 was cut and spliced from many different parts of multiple conversations, then restitched together to falsely portray Plaintiff's views as extreme or sensational.

25.    The snippet of conversation that ended up embedded in said "New York Times" Op - Ed on September 19, 2017 falsely attributed views to Plaintiff which are not his by presenting incomplete statements and false juxtapositions.

26.    Upon information and belief, Hermansson or someone acting in concert with him edited the video tape of Professor Jorjani, or perhaps the author of the "New York Times" Op Ed on September 19, 2017 edited the video tape of Professor Jorjani.  In any event, prior to publication by the New York Times, someone deliberately edited the video tape so

that the snippet of conversation falsely portrayed Plaintiff's views as extreme or sensational.

27.    Nevertheless, the fact that the snippet of conversation that was embedded in said "New York Times" Op - Ed had been heavily edited was an obvious fact.

28.    Plaintiff had also briefly addressed a conference known as the National Policy Institute in November of 2016, which he attended to promote books printed by a publisher of which he was then editor (said publisher being Arktos Media, Ltd.).   At said conference, Plaintiff spoke about, *inter alia*, the constructive criticism of the contemporary political order and modern culture offered by the books published by Arktos Media, which subjects are unquestionably matters of public concern.  Also, Plaintiff had again been speaking off campus and on his own time.

29.    Part of Plaintiff's words delivered to the National Policy Institute also ended up embedded in the "New York Times" Op - Ed on September 19, 2017, again in truncated form.

30.    On or about the Fall of 2016, Plaintiff also formed alliances within the loose body of fellow citizens who associated with the political movement known as the Alt Right in order to widen the message of his philosophy, which he describes as an affirmation of the Indo–European Tradition, which he further describes as the idea that European cultures are intimately related to those of Greater Iran and the Persianate World, Hindu India and the Buddhist East and are the sources the world's greatest scientific, artistic and spiritual developments.  On or about January of 2017, Plaintiff formed the Alt Right Corporation

with the aim of broadening this message.  Said activities were unquestionably protected political activities.

31.    On or about September 19, 2017, Defendants Bloom and Belfield read said "New York Times" Op - Ed of September 19, 2017, which featured the embedded snippet of conversation from Plaintiff.

32.    Defendants Bloom and Belfield realized that the snippet was appearing in the Op-Ed section of the "New York Times."

33.    Defendants Bloom and Belfield knew that Op-Ed section of the "New York Times" is a venue reserved for political commentary and other tendentious pieces (in contrast to the fact oriented News section of the paper).

34.    Defendants Bloom and Belfield also realized that the embedded snippet of conversation from Plaintiff had been heavily edited, and cut and spliced from many different parts of multiple conversations, then restitched together.

35.    Nevertheless, on September 20, 2017, less than 24 hours after the appearance of the "New York Times Op -Ed" featuring Plaintiff, Defendants Bloom and Belfield initiated a campaign against Plaintiff by sending a faculty and staff wide e-mail which stated the following:

> "NJIT is a university that embraces diversity and sees it as a source of strength.  The statements made by Mr. Jorjani in a video recently published by The New York Times are repugnant and antithetical to our institution's core values."

36.     Thus, in their Mass Email of September 20th, Defendants Bloom and Belfield implied that the sensationalized views falsely attributed to Plaintiff in the snippet embedded in the New York Times Op-Ed of September 19, 2017 were accurate.

37.     Defendants Bloom and Belfield sent said Mass Email without contacting Plaintiff to obtain his side of the story.

38.     Defendants Bloom and Belfield sent said Mass Email before Plaintiff was afforded any opportunity in the presses to present his side of the story.

39.     Furthermore, Defendants Bloom and Belfield were clearly signaling that they supported an intellectual witch hunt against Plaintiff, for they explicitly took issue with off campus statements allegedly made by Plaintiff, rather than with any overt actions or interactions attributed to the Plaintiff.

40.     Strongly disapproving of what they took Plaintiff to be speaking as a citizen, Defendants Bloom and Belfield resolved to subject Plaintiff to both institutional censorship and discipline.

41.     Said email of September 20th was leaked to the student body, and so passed from being a faculty wide e-mail to a system wide e-mail, which event was foreseeable by Defendants Bloom and Belfield.

42.     Five days later, on September 25, 2017, Defendants orchestrated the suspension of Plaintiff without affording him either notice or hearing.

43.     Plaintiff was notified of his suspension as it occurred by letter dated September 25, 2017, which stated in relevant part:

- 10 -

"We are aware of a recent New York Times article, as well as your responses to that article. The article as related to you has caused significant disruption at the university, and based on our information, we believe that the disruption will continue to expand. Further, the article and subsequent information provided by you reveals your association with organizations that were not disclosed on your outside activity forms, despite being directed by your Chair to fully update your outside activity disclosure form last Spring.

"Given the disruptive impact of these events upon the university community, we are placing you on paid administrative leave effective immediately...

44.    Defendant Bloom then caused an investigation to be made of Plaintiff, with the aim of having him fired, or at least not renewed beyond the current school year.

45.    The investigation into "association with organizations that were not disclosed on [Plaintiff's] outside activity forms" and other alleged ethical lapses was a mere pretext. Rather, Plaintiff was being targeted because Defendant Bloom disapproved of the content of his speech and because of his association with a political movement he despised.

46.    Defendants Bloom and Belfield then succeeded in whipping up a campaign against Plaintiff as other faculty members began to join in the ritual defamation.

47.    Thus on October 4, 2017, Defendant Russell and others, following Defendant Bloom and Belfield's example, castigated Plaintiff with the following words published in "The Vector" (NJIT's school newspaper):

"On current events, we strongly object to the use of pseudoscience to support racist ideology. In particular, we object to attempts to use details related to human evolution to support eugenics and white supremacy. Such opinions have been expressed by Jason Reza Jorjani, who until recently taught some of our students in courses on science, technology and society. What we have learned in the last decade and a half of human genomics, and more than a century of human paleontology, is that humans share much more than they differ; and that epigenetics, development and environmental factors can have as much effect as the slight genetic difference among individuals. We believe that Dr. Jorjani's

beliefs, as revealed by his remarks, cannot help but produce a discriminatory and intimidating educational environment for our diverse student body. This makes him unfit to teach at NJIT, or indeed at any academic institution that considers its students to have equal value and potential."

48.    And again on October 12, 2017, following Defendant Bloom and Belfield's example,

Defendant Klobucar and others castigated Plaintiff with the following words published in

"The Vector":

"NJIT is a university that embraces diversity and sees that diversity as a source of strength.  The NJIT Faculty Senate finds racist pronouncements made by University Lecturer Jason Reza Jorjani to be morally repugnant. Hate and bigotry have no place on the NJIT campus."

49.    And again on October 25, 2017, following Defendant Bloom and Belfield's example,

Defendant Maher and others castigated Plaintiff with the following words published in

"The Vector":

"We, the faculty and staff of the Federated Department of History at New Jersey Institute of Technology, are writing to denounce NJIT University Lecturer Jason Jorjani's views on race in his comments, writings, and interviews. A recent New York Times exposé, 'Undercover with the Alt-Right,' highlighted his association with the alt-right, a white supremacist movement, and his apparent enthusiasm about the redemption of Adolf Hitler as a great world leader."

"Troubling as those comments are, they are consistent with his other public statements, which indicate that Dr. Jorjani is a proponent of racist ideologies. Dr. Jorjani's online article, 'Against Perennial Philosophy,' in which he identifies himself as an NJIT faculty member, expresses a view of race and intelligence harking back to eugenic beliefs and 'scientific racism' long since debunked by scientists."

"As scholars of the past, we are well-prepared to provide historical context to the Aryan supremacism, eugenics, and theories of race put forth by Dr. Jorjani. In the 20th century alone, race theories and eugenic beliefs were used to support forced sterilization laws, Jim Crow legislation, restrictive immigration quotas, and the Holocaust. These ideas are not valid science but rather are reflective of prejudice and power. Just as slave owners in antebellum America utilized the now-debunked science of phrenology to

justify the bondage of African-Americans, so Jorjani utilizes discredited
scientific studies on intelligence and heredity in order to segregate people
into racial and ethnic hierarchies on the basis of his unscientific assumptions
about their fitness for participation in civilized society."

"How can we trust Dr. Jorjani to educate and evaluate our students? Are we
to assume that his published views on the 'innate capacities' of different
racial and ethnic groups will not influence his judgment about the diverse
student body at NJIT?  Dr. Jorjani's published beliefs create a hostile
learning environment for students of color in particular, and his presence on
the instructional staff at NJIT appears to legitimize discredited race-based
ideas about intelligence and citizenship that have no place in academia.  It is
our collective belief that Dr. Jorjani's eventual termination as a University
Lecturer would be justified and consistent with the principles of academic
freedom and NJIT's mission."

50.    By letter dated February 13, 2018, the Defendants notified Plaintiff that they were

refusing to renew his employment contract beyond the current school year.  Said letter

was signed by NJIT Provost Fadi P. Deek and was copied to, among others, Defendant

Belfield.

51.    Defendants' said refusal to renew plaintiff's contract was not related to any alleged

ethical lapses, which were mere pretexts for his severance from NJIT.  Rather,

Defendant's non-renewal and severance of Plaintiff were due to his engagement in

speech which content was disapproved of by Defendants and his association with a

political movement of which Defendants also disapproved.

FIRST CAUSE OF ACTION – FIRST AMENDMENT RETALIATION

52.    Plaintiff repeats and realleges ¶¶ 1– 51 above.

- 13 -

53. The Plaintiff engaged in protected speech regarding matters of public concern when he was surreptitiously taped during the events referenced at ¶¶ 19–22 above and when he spoke at the NPI conference referenced at ¶ 28 above.

54. The Plaintiff engaged in protected political activities when he formed the Alt Right Corporation, referenced at ¶ 30 above.

55. Defendant Bloom, in and through the authority vested in him by subsection (h) of N.J.S.A. 18A:64E-18, and NJIT Bylaws Article III, §§1 & 2 (D), among others, caused Plaintiff's suspension on September 25, 2017 and launched an investigation of Plaintiff.

56. In so doing, Defendant Bloom abused the authority vested in him and had the aim of having Plaintiff fired or, at the very least, not renewed beyond the current academic year.

57. Defendant NJIT (through the Board of Trustees) ratified Defendant Bloom's actions, which were unconstitutional.

58. The Defendants NJIT (through the Board of Trustees) and Bloom took adverse actions against the Plaintiff when they suspended him without notice, hearing or investigation, then launched a pretextual investigation of him, and then refused to renew his contract beyond the current year (as indicated by said letter dated February 13, 2018).

59. A causal link exists between the protected speech and protected political activities on the one hand and the subsequent adverse actions set forth above; indeed, such protected speech and political activities were a substantial motivating factor in

    a.    the decision by Defendants NJIT (through the Board of Trustees) and Bloom to suspend Plaintiff;

b.    the decision by Defendants NJIT (through the Board of Trustees) and Bloom to launch a pretextual investigation of Plaintiff; and

c.    the decision by Defendants NJIT (through the Board of Trustees) and Bloom to refuse to renew Plaintiff's contract beyond the current year.

60.    The actions of Defendants Defendants NJIT (through the Board of Trustees), and Bloom set forth above violated Plaintiff's right of free speech as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

61.    As a result of the foregoing, Plaintiff has been damaged by the loss of income, loss of professional stature, loss of profession, and public humiliation.

62.    Wherefore Plaintiff demands compensatory and punitive damages, jointly and severally, in an amount to be determined at trial; and for the costs of this action, attorney's fees and such other further and different relief as this court deems just and proper.

### SECOND CAUSE OF ACTION – DEFAMATION BY BLOOM & BELFIELD

63.    Plaintiff repeats and realleges ¶¶ 1–62 above.

64.    On September 20, 2017, Defendants Bloom and Belfield caused the Mass Email of September 20th referenced above to be sent to all faculty and staff at NJIT.

65.    The Mass Email of September 20th referred to Plaintiff by name, was made of and concerning Plaintiff, and was so understood by those who read it .

66.    The Mass Email of September 20th:

a.    implied that the sensationalized views attributed to Plaintiff in the snippet

embedded in the New York Times Op-Ed of September 19, 2017 were truly and

accurately attributed to Plaintiff, which is false.

b.    implied that Plaintiff himself was morally repugnant and unfit to teach at NJIT,

which is false.

67.    The Mass Email of September 20th is libelous on its face.  It clearly exposes Plaintiff to

hatred, contempt, ridicule, and obloquy because it charges Plaintiff with moral

repugnancy and being unfit to teach at NJIT.

68.    The Mass Email of September 20th was seen and read on or about September 20, 2017

and thereafter by the faculty, staff and students of NJIT, and initiated a campaign against

Plaintiff, which was its foreseeable and intended result.

69.    The Mass Email of September 20th was sent despite the fact that Defendants Bloom and

Belfield knew it to be false, or in reckless disregard of its falsity; or in the alternative,

Defendants Bloom and Belfield were negligent in sending said Mass Email.

70.    As a proximate result of the above, Plaintiff has suffered loss of his reputation, shame,

mortification, injury to his feelings, all to his damage.

71.    The above-described publication was not privileged because it was published by

Defendants Bloom and Belfield with malice, and ill will toward Plaintiff.

72.    On February 9, 2018, Plaintiff caused a written request for retraction to be sent to

Defendants Bloom and Belfield, which requested that they retract the libelous charge in

as public a manner as that in which it was made, but they have failed to honor Plaintiff's

request within a reasonable amount of time; and indeed have failed to honor it

whatsoever.

73.    Because of Defendants' malice or reckless disregard in publishing the Mass Email of

September 20th, Plaintiff seeks punitive damages.

74.    Wherefore Plaintiff demands compensatory and punitive damages, jointly and severally,

in an amount to be determined at trial; and for the costs of this action, attorney's fees and

such other further and different relief as this court deems just and proper.


THIRD CAUSE OF ACTION – DEFAMATION BY RUSSELL

75.    Plaintiff repeats and realleges ¶¶ 1–74 above.

76.    On October 4, 2017, Defendant Russell caused the statement referenced in ¶47 above

("The October 4th Statement") to be published in "The Vector."

77.    The October 4th Statement appeared in the school newspaper and was widely read by the

faculty, staff and students of NJIT; and by diverse people on line.

78.    The October 4th Statement referred to Plaintiff by name, was made of and concerning

Plaintiff, and was so understood by those who read it.

79.    The October 4th Statement:

a.    implied that the sensationalized views attributed to Plaintiff in the snippet

embedded in the New York Times Op-Ed of September 19, 2017 were truly and

accurately attributed to Plaintiff, which is false.

- 17 -

b. implied that Plaintiff himself had peddled pseudo–science and racism, was morally repugnant, created a discriminatory and intimidating educational environment, and was unfit to teach at NJIT, all of which are false.

80. The October 4th Statement is libelous on its face.  It clearly exposes Plaintiff to hatred, contempt, ridicule, and obloquy because it charges Plaintiff with moral repugnancy and being unfit to teach at NJIT.

81. The October 4th Statement was seen and read on or about October 4, 2017 and thereafter by the faculty, staff and students of NJIT, and was part of a campaign against Plaintiff.

82. The October 4th Statement was published despite the fact that Defendant Russell knew it to be false, or in reckless disregard of its falsity; or in the alternative, Defendant Russell was negligent in making the October 4th Statement.

83. As a proximate result of the above, Plaintiff has suffered loss of his reputation, shame, mortification, injury to his feelings, all to his damage.

84. The above-described publication was not privileged because it was published by Defendant Russell with malice, and ill will toward Plaintiff.

85. On February 9, 2018, Plaintiff caused a written request for retraction to be sent to Defendant Russell, which requested that he retract the libelous charge in as public a manner as that in which it was made, but he has failed to honor Plaintiff's request within a reasonable amount of time; and indeed has failed to honor it whatsoever.

86. Because of Defendant's malice or reckless disregard in publishing the October 4th Statement, Plaintiff seeks punitive damages.

87.    Wherefore Plaintiff demands compensatory and punitive damages, jointly and severally, in an amount to be determined at trial; and for the costs of this action, attorney's fees and such other further and different relief as this court deems just and proper.

FOURTH CAUSE OF ACTION – DEFAMATION BY KLOBUCAR

88.    Plaintiff repeats and realleges ¶¶ 1–87 above.

89.    On October 12, 2017, Defendant Klobucar caused the statement referenced in ¶48 above ("The October 12th Statement") to be published in "The Vector."

90.    The October 12th Statement appeared in the school newspaper and was widely read by the faculty, staff and students of NJIT; and by diverse people on line.

91.    The October 12th Statement referred to Plaintiff by name, was made of and concerning Plaintiff, and was so understood by those who read it.

92.    The October 12th Statement:

    a.    implied that the sensationalized views attributed to Plaintiff in the snippet embedded in the New York Times Op-Ed of September 19, 2017 were truly and accurately attributed to Plaintiff, which is false.

    b.    stated and implied that Plaintiff himself was full of racism, hatred and bigotry, and was unfit to teach at NJIT, all of which are false.

93.    The October 12th Statement is libelous on its face.  It clearly exposes Plaintiff to hatred, contempt, ridicule, and obloquy because it charges Plaintiff with moral repugnancy, race hatred, and being unfit to teach at NJIT.

94.    The October 12th Statement was seen and read on or about October 12, 2017 and thereafter by the faculty, staff and students of NJIT, and was part of a campaign against Plaintiff.

95.    The October 12th Statement was published despite the fact that Defendant Klobucar knew it to be false, or in reckless disregard of its falsity; or in the alternative, Defendant Klobucar was negligent in making the October 12th Statement.

96.    As a proximate result of the above, Plaintiff has suffered loss of his reputation, shame, mortification, injury to his feelings, all to his damage.

97.    The above-described publication was not privileged because it was published by Defendant Klobucar with malice, and ill will toward Plaintiff.

98.    On February 9, 2018, Plaintiff caused a written request for retraction to be sent to Defendant Klobucar, which requested that he retract the libelous charge in as public a manner as that in which it was made, but he has failed to honor Plaintiff's request within a reasonable amount of time; and indeed has failed to honor it whatsoever.

99.    Because of Defendant's malice or reckless disregard in publishing the October 12th Statement, Plaintiff seeks punitive damages.

100.    Wherefore Plaintiff demands compensatory and punitive damages, jointly and severally, in an amount to be determined at trial; and for the costs of this action, attorney's fees and such other further and different relief as this court deems just and proper.

FIFTH CAUSE OF ACTION – DEFAMATION BY MAHER

101.    Plaintiff repeats and realleges ¶¶ 1–100 above.

- 20 -

102.    On October 25, 2017, Defendant Maher caused the statement referenced in ¶49 above ("The October 25th Statement") to be published in "The Vector."

103.    The October 25th Statement appeared in the school newspaper and was widely read by the faculty, staff and students of NJIT; and by diverse people on line.

104.    The October 25th Statement referred to Plaintiff by name, was made of and concerning Plaintiff, and was so understood by those who read it.

105.    The October 25th Statement:

    a.    implied that the sensationalized views attributed to Plaintiff in the snippet embedded in the New York Times Op-Ed of September 19, 2017 were truly and accurately attributed to Plaintiff, which is false.

    b.    stated and implied that Plaintiff was a white supremacist and enthusiastic about the redemption of Adolf Hitler as a world leader, which are false.

    c.    stated that Plaintiff was a proponent of racist ideology, which is false.

    d.    stated that Plaintiff peddled pseudo–science and racism, which is false.

    e.    implied that Plaintiff peddled racial theories equivalent to those underlying slavery, Jim Crow laws and the Holocaust, which is false.

    f.    attributed Plaintiff's views to prejudice and power, which is false.

    g.    implied that Plaintiff could not be trusted to educate the students of NJIT, which is false.

    h.    accused Plaintiff of creating a hostile learning environment for students of color in particular, which is false.

i.   Moreover, the October 25th Statement explicitly accused Plaintiff of creating said "hostile learning environment" through engaging in unorthodox thought, which – in addition to being absurd and manifestly false – is tantamount to accusing Plaintiff of "Thought Crime." It is an Orwellian accusation that exposes the reeking hypocrisy of an academic who has falsely wrapped himself in the mantle of academic freedom.

j.   asserted that Plaintiff's continued employment at NJIT legitimized discredited ideas that have no place in academia, which is false.

106.   The October 25th Statement is libelous on its face. It clearly exposes Plaintiff to hatred, contempt, ridicule, and obloquy because it charges Plaintiff with moral repugnancy and being unfit to teach at NJIT and explicitly called for Plaintiff to be fired.

107.   The October 25th Statement was seen and read on or about October 25, 2017 and thereafter by the faculty, staff and students of NJIT, and was part of a campaign against Plaintiff.

108.   The October 25th Statement was published despite the fact that Defendant Maher knew it to be false, or in reckless disregard of its falsity; or in the alternative, Defendant Maher was negligent in making the October 25th Statement.

109.   As a proximate result of the above, Plaintiff has suffered loss of his reputation, shame, mortification, injury to his feelings, all to his damage.

110.   The above-described publication was not privileged because it was published by Defendant Maher with malice, and ill will toward Plaintiff.

111.   On February 9, 2018, Plaintiff caused a written request for retraction to be sent to Defendant Maher, which requested that he retract the libelous charge in as public a manner as that in which it was made, but he has failed to honor Plaintiff's request within a reasonable amount of time; and indeed has failed to honor it whatsoever.

112.   Because of Defendant's malice or reckless disregard in publishing the October 25th Statement, Plaintiff seeks punitive damages.

113.   Wherefore Plaintiff demands compensatory and punitive damages, jointly and severally, in an amount to be determined at trial; and for the costs of this action, attorney's fees and such other further and different relief as this court deems just and proper.

WHEREFORE PLAINTIFF DEMANDS JUDGMENT:

a.     On the First Cause of Action, for compensatory and punitive damages in excess of Five Million Dollars, jointly and severally; and for the costs of this action, attorney's fees and such other further and different relief as this court deems just and proper.

b.     On the Second Cause of Action, for compensatory and punitive damages in excess of Five Million Dollars, jointly and severally; and for the costs of this action, attorney's fees and such other further and different relief as this court deems just and proper.

c.     On the Third Cause of Action, for compensatory and punitive damages in excess of Five Million Dollars, jointly and severally; and for the costs of this action,

attorney's fees and such other further and different relief as this court deems just and proper.

d.     On the Fourth Cause of Action, for compensatory and punitive damages in excess of Five Million Dollars; and for the costs of this action, attorney's fees and such other further and different relief as this court deems just and proper.

e.     On the Fifth Cause of Action, for compensatory and punitive damages in excess of Five Million Dollars; and for the costs of this action, attorney's fees and such other further and different relief as this court deems just and proper.

Dated: Monroe, New York        Yours, etc.
       July 16, 2018

                               /s/_____
                               Frederick C. Kelly, Esq.
                               *Attorney for Plaintiff*
                               28 Roe Circle
                               Monroe, NY 10950
                               (845) 325-6759
                               *Pro Hac Vice Application Pending*

                               /s/_____
                               Foulke Law Firm – Of Counsel to Attorney Kelly
                               55 Main Street
                               Goshen, NY 10924
                               (845) 294-4308