# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JASON JORJANI,<br><br>Plaintiff,<br><br>v.<br><br>NEW JERSEY INSTITUTE OF TECHNOLOGY, *et al.*,<br><br>Defendants. | Docket No.: 18-cv-11693<br><br>OPINION |

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter comes before the Court on Defendants New Jersey Institute of Technology, Joel S. Bloom, Kevin J. Belfield, Gareth J. Russell, Andrew Klobucar, and Neil Maher's ("Defendants'") collective Motion to Dismiss Counts Two through Five of the Complaint with Prejudice. ECF No. 9. For the reasons set forth below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND[1]

Plaintiff Jason Jorjani ("Plaintiff") brings this action for First-Amendment retaliation (Count One) and defamation (Counts Two through Five) against the New Jersey Institute of Technology ("NJIT") and various NJIT professors and officers ("Defendants"). Compl. ¶¶ 4-11, ECF No. 1. Defendants move to dismiss the defamation counts. Mot. to Dismiss, ECF No. 9 ("Motion")

Plaintiff is a New York resident formerly employed as a lecturer by NJIT, a public university in Newark, New Jersey. *Id.* ¶¶ 4-5. In fall 2016, Plaintiff "formed alliances within . . . the Alt Right" to promote his philosophy of "affirmation of the Indo-European Tradition" or "the idea that European cultures are intimately related to those of Greater Iran . . . and are the sources of the world's greatest scientific, artistic and spiritual developments." *Id.* ¶ 30. To broaden his message, Plaintiff formed the "Alt Right Corporation." *Id.*

### A. New York Times Op-Ed

In summer 2017, a graduate student purportedly named Erik Hellberg interested in "how the Left persecutes and silences Right wing thought in academia" set up a meeting with Plaintiff to discuss the topic. *Id.* ¶ 21. In actuality, Hellberg was an agent of the ideological watchdog group "Hope Not Hate," which has the goal of "deconstructing" individuals it labels fascists or

---

[1] The following facts, taken from the Complaint and documents "integral to or explicitly relied upon in the [C]omplaint," are accepted as true for the purpose of this Opinion. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

1

extremists. *Id.* ¶ 20. Hellberg (real name Patrik Hermansson) secretly videotaped their conversation, which touched on matters of race, immigration, and politics. *Id.* ¶¶ 19, 22.

On September 19, 2017, the New York Times ("NYT") published an op-ed ("Op-Ed") containing an edited version of the recorded conversation ("Recording"). *Id.* ¶¶ 23-24. In the Recording, Plaintiff states, *inter alia*: "We will have a Europe, in 2050 where the banknotes have Adolf Hitler, Napoleon Bonaparte, Alexander the Great. And Hitler will be seen like that: like Napoleon, Like Alexander; not like some weird monster, who is unique in his own category. No, he's just going to be seen as a great European leader." Jesse Singal, *Undercover With the Alt-Right*, NYT Op-Ed (Sept. 19, 2017), https://www.nytimes.com/2017/09/19/opinion/alt-right-white-supremacy-undercover.html (incorporated by reference in the Complaint).

According to Plaintiff, the Recording was "cut and spliced from many different parts of multiple conversations, then restitched together to falsely portray Plaintiff's views as extreme or sensational." Compl. ¶ 24. "The fact that the snippet . . . had been heavily edited was an obvious fact." *Id.* ¶ 27. The Recording thus "falsely attributed views to Plaintiff." *Id.* ¶ 25.

### B. Public Rebuke by NJIT Leadership and Faculty

After viewing the Op-Ed and Recording—and allegedly knowing it was heavily edited—Defendants Joel S. Bloom (President of NJIT) and Kevin J. Belfield (Dean of the NJIT College of Science and Liberal Arts) sent a faculty- and staff-wide email ("B&B Email") stating:

> NJIT is a university that embraces diversity and sees it as a source of strength. The statements made by Mr. Jorjani in a video recently published by the [NYT] are repugnant and antithetical to our institution's core values.

*Id.* ¶ 35 (Count Two). Five days later, NJIT suspended Plaintiff and launched an investigation. *Id.* ¶¶ 43-45.

On October 4, 2017, Defendant Gareth J. Russel (Chair of the NJIT Biology Department) published a statement ("Russel Statement") in NJIT's student newspaper, the Vector:

> On current events, we strongly object to the use of pseudoscience to support racist ideology. In particular, we object to attempts to use details related to human evolution to support eugenics and white supremacy. Such opinions have been expressed by Jason Reza Jorjani, who until recently taught some of our students in courses on science, technology and society. What we have learned in the last decade and a half of human genomics, and more than a century of human paleontology, is that humans share much more than they differ; and that epigenetics, development and environmental factors can have as much effect as the slight genetic difference among individuals. We believe that Dr. Jorjani's beliefs, as revealed by his remarks, cannot help but produce a discriminatory and intimidating educational environment for our diverse student body. This makes him unfit to teach at NJIT, or indeed at any academic institution that considers its students to have equal value and potential.

*Id.* ¶ 47 (Count Three).

Then on October 12, Defendant Andrew Klobucar (Chair of the NJIT Biology Department) stated in the Vector ("Klobucar Statement") that "NJIT is a university that embraces diversity and sees that diversity as a source of strength. The NJIT Faculty Senate finds racist pronouncements made by University Lecturer Jason Reza Jorjani to be morally repugnant. Hate and bigotry have no place on the NJIT campus." *Id.* ¶ 48 (Count Four).

Finally, on October 25, Defendant Neil J. Maher (Chairman of the NJIT Federated Department of History) published a response in the Vector ("Maher Statement"):

> We, the faculty and staff of the Federated Department of History at New Jersey Institute of Technology, are writing to denounce NJIT University Lecturer Jason Jorjani's views on race in his comments, writings, and interviews. A recent [NYT] exposé, 'Undercover with the Alt-Right,' highlighted his association with the alt-right, a white supremacist movement, and his apparent enthusiasm about the redemption of Adolf Hitler as a great world leader.
>
> Troubling as those comments are, they are consistent with his other public statements, which indicate that Dr. Jorjani is a proponent of racist ideologies. Dr. Jorjani's online article, 'Against Perennial Philosophy,' in which he identifies himself as an NJIT faculty member, expresses a view of race and intelligence harking back to eugenic beliefs and 'scientific racism' long since debunked by scientists.
>
> As scholars of the past, we are well-prepared to provide historical context to the Aryan supremacism, eugenics, and theories of race put forth by Dr. Jorjani. In the 20th century alone, race theories and eugenic beliefs were used to support forced sterilization laws, Jim Crow legislation, restrictive immigration quotas, and the Holocaust. These ideas are not valid science but rather are reflective of prejudice and power. Just as slave owners in antebellum America utilized the now-debunked science of phrenology to justify the bondage of African-Americans, so Jorjani utilizes discredited scientific studies on intelligence and heredity in order to segregate people into racial and ethnic hierarchies on the basis of his unscientific assumptions about their fitness for participation in civilized society.
>
> How can we trust Dr. Jorjani to educate and evaluate our students? Are we to assume that his published views on the 'innate capacities' of different racial and ethnic groups will not influence his judgment about the diverse student body at NJIT? Dr. Jorjani's published beliefs create a hostile learning environment for students of color in particular, and his presence on the instructional staff at NJIT appears to legitimize discredited race-based ideas about intelligence and citizenship that have no place in academia. It is our collective belief that Dr. Jorjani's eventual termination as a University Lecturer would be justified and consistent with the principles of academic freedom and NJIT's mission.

*Id.* ¶¶ 9, 47 (Count Five).

On February 13, 2018, Plaintiff learned his employment contract would not be extended beyond the current school year. *Id.* ¶ 50. Plaintiff filed suit complaining of First-Amendment retaliation (Count One) and defamation (Counts Two-Five) based on the above-quoted statements ("Statements"). Defendants moved to dismiss the defamation counts.

## II. DISCUSSION

### A. Motion to Dismiss Legal Standard

FRCP 12(b)(6) provides for the dismissal of a complaint if the plaintiff fails to state a claim upon which relief can be granted. The movant bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). "[A]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). But the court is not required to accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FRCP 9(b). However, pleaded states of mind must still be plausible to pass muster. *See Berkery v. Gudknecht*, No. CV 17-5574, 2018 WL 3549228, at *3 (E.D. Pa. July 24, 2018) (citing First, Second, Fourth, Tenth, and Eleventh Circuits).

### B. Defamation Legal Standard

Defamation claims require "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *DeAngelis v. Hill*, 847 A.2d 1261, 1267-68 (N.J. 2004) (quoting Restatement (Second) of Torts § 558). When the allegedly defamatory statement regards a matter of public concern, plaintiffs must allege "actual malice." *W.J.A. v. D.A.*, 43 A.3d 1148, 1156 (N.J. 2012). "Actual malice" means publication with knowledge that a statement is false or with a high degree of awareness of its probable falsity (i.e., reckless disregard). *Lynch v. New Jersey Educ. Ass'n*, 735 A.2d 1129, 1135-36 (N.J. 1999). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citation omitted).

To be "defamatory," a statement must "tend[] to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him." *Lynch*, 735 A.2d at 1153. Three factors guide the analysis: (1) content; (2) context; and (3) verifiability. *Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1113 (N.J. 2009) (citation omitted). As to "content," courts "consider the fair and natural meaning that will be given to the statement by

4

reasonable persons of ordinary intelligence." *Id.* at 1114 (citation omitted). Context also colors a statement's "reasonable interpretation." *Id.* (citation omitted).

As to "verifiability," courts "determine whether the statement is one of fact or opinion." *Id.* (citation omitted). Statements of opinion generally cannot trigger defamation liability unless they imply verifiably-false underlying facts. *Id.* (citation omitted); *Lynch*, 735 A.2d at 1137. Even factual assertions are only actionable if they "could be proven true or false." *Leang*, 969 A.2d at 1113 (citation omitted).

Whether a statement is one of fact or opinion, and more broadly whether it is susceptible to defamatory meaning, is a question of law for the Court. *Kotlikoff v. The Cmty. News*, 444 A.2d 1086, 1088 (N.J. 1982). Statements of "pure" opinion—i.e., when the speaker states the facts on which an opinion is based—cannot trigger liability. *Id.* at 1089. "Mixed" opinions— i.e., opinions that imply undisclosed defamatory falsehoods—may be actionable if the implications themselves could be. *Id.* "[I]nsults, epithets, name-calling, and other forms of verbal abuse, although offensive, are not defamatory." *Lynch*, 735 A.2d at 1137. Therefore, an allegation of racism alone is not actionable, but if the statement falsely implies someone engaged in specific acts (e.g., made racist statements or refused to employ a certain race), it may be defamatory. *Ward v. Zelikovsky*, 643 A.2d 972, 983-84 (N.J. 1994). "Even under those facts, a court would need to examine the context in which the statements were made before it determined that the statements could properly form the basis of a lawsuit." *Id.* In any event, if the factual implications are accurate, no liability will attach. *E.g., DeAngelis*, 847 A.2d at 1267-68.

### C. Application to Allegedly Defamatory Statements and Their Implications

Plaintiff alleges the Statements explicitly stated—or at least implied—various false and defamatory facts about him. Defendants argue the Statements and their implications were opinion, true, or made without malice. As many of the alleged Statements and their implications are the same or analogous, they will be analyzed together.

#### 1. Accurate Attribution of the Recording

In all four defamation-based causes of action (Counts Two through Five), Plaintiff alleges that the Statements "implied that the sensationalized views attributed to Plaintiff in the snippet embedded in the New York Times Op-Ed of September 19, 2017, were truly and accurately attributed to Plaintiff, which is false." Compl. ¶¶ 66(a), 79(a), 92(a), 105(a). Whether Plaintiff holds the views set forth in the Recording is a factual issue, and Plaintiff alleges he does not. *Id.* Therefore, the alleged implication can produce defamation liability if it was made with the requisite level of culpability.

The Statements all regard matters of public concern. *See Snyder*, 562 U.S. at 453. Therefore, to state a claim, Plaintiff must plausibly allege Defendants made them with "actual malice." *See W.J.A.*, 43 A.3d at 1156; *Berkery*, 2018 WL 3549228, at *3. As discussed above, "actual malice" means publication with knowledge that a statement is false or with reckless disregard to its falsity, not ill will. *Lynch*, 735 A.2d at 1136. Therefore, for liability to attach, Defendants would have had to know Plaintiff did not hold the views attributed to him in the Recording but imply he held those views anyway, or at least have a "high degree of awareness of [the implication's] probable falsity." *Lynch*, 735 A.2d at 1135.

Plaintiff fails to plausibly allege actual malice. The Complaint alleges malice generally. Compl. ¶¶ 69, 82, 95, 108 ("The [statements were published] despite the fact that [Defendants] knew [them] to be false, or in reckless disregard of [their] falsity; or in the alternative, [Defendants were] negligent in making the [Statements]."). And Plaintiff makes somewhat-related factual allegations. *Id.* ¶¶ 27 (it "was an obvious fact" that the Recording had been heavily edited), 34 ("Bloom and Belfield also realized [the Recording] had been heavily edited, and cut and spliced from many different parts of multiple conversations, then restitched together."). But the general allegation is implausible because the facts alleged do not support an inference that Defendants knew the Recording was edited *to misconstrue* Plaintiff's actual views. Videos shorter than the real-life events they portray are often "cut and spliced from many different parts" of longer recordings. That fact, without more, does not imply the video misrepresents what actually happened. Therefore, Plaintiff failed to plausibly allege Defendants acted with actual malice in implying the Recording accurately attributed views to Plaintiff.[2] Accordingly, the claims related to such implications are **DISMISSED**.

### 2. Moral Repugnancy and Unfitness to Teach

Plaintiff alleges that the B&B Email (Count Two) and Russel and Klobucar Statements (Counts Three and Four, respectively) implied that Plaintiff was (1) "unfit to teach at NJIT" while the B&B Email and Russel Statement also implied Plaintiff was (2) "morally repugnant." Compl. ¶¶ 66(b), 79(b), 92(b). The Complaint further alleges the Russel Statement implied Plaintiff (3) "created a discriminatory and intimidating educational environment" while the Maher Statement (Count Five) (4) "implied that Plaintiff could not be trusted to educate" NJIT students and (5) "accused Plaintiff of creating a hostile learning environment," particularly for students of color, including through "engaging in unorthodox thought." *Id.* ¶¶ 79(b), 105(g)-(i).

The alleged implications regarding fitness or trustworthiness to teach; creation of a discriminatory, hostile, or intimidating educational environment; and moral repugnancy are unverifiable opinions. *See Leang*, 969 A.2d at 1114 (requiring verifiably-false underlying facts to trigger defamation liability). Read considering their full content and context, the Statements

---

[2] While the Third Circuit has yet to opine on whether the plausibility standard applies to allegations of malice, every circuit that has addressed the issue agrees it does. *See Berkery*, WL 3549228, at *3 (collecting cases). For example, in *Biro v. Conde Nast*, the Second Circuit affirmed a district court's conclusions that (1) the plausibility standard applied and (2) plaintiff failed to meet it. 807 F.3d 541, 544-46 (2d Cir. 2015). Both the trial and appellate courts concluded the plaintiff failed to plausibly allege malice despite allegations remarkably similar to those contained in the Complaint here. *Compare Biro v. Conde Nast*, 963 F. Supp. 2d 255, 284 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015) (finding failure to plead actual malice despite allegations that defendants "either knew or believed or had reason to believe that many of the statements of fact in the Article were false and inaccurate, and nonetheless published them anyway" and "acted with actual malice, or in reckless disregard of the truth, or both"), *with*, Compl. ¶¶ 69, 82, 95, 108 ("The [statements were published] despite the fact that [Defendants] knew [them] to be false, or in reckless disregard of [their] falsity; or in the alternative, [Defendants were] negligent in making the [Statements]."); *see also Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) ("Appellants' assertion that Appellees' statements 'were known by [them] to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity' is entirely insufficient.").

6

did not state or imply anything objective about the application of education regulations to Plaintiff's conduct, only Defendants opinions about Plaintiff's fitness to teach. Thus, there is no false facts in these alleged implications.[3] *See Kotlikoff*, 444 A.2d at 1088 (holding that whether a statement is one of fact or opinion is a question of law courts decide). Therefore, claims based on the allegation that Defendants implied Plaintiff was morally repugnant or unfit to teach (in the various forms alleged in Counts Two through Five) are **DISMISSED**.

### 3. Peddling Pseudoscience and Racism and Legitimizing Discredited Ideas

Plaintiff alleges the Russel and Maher Statements (Counts Three and Five, respectively) stated or implied Plaintiff "peddled pseudo-science and racism" while the Maher Statement also implied Plaintiff peddled "racial theories equivalent to those underlying slavery, Jim Crow laws and the Holocaust." Compl. ¶ 79(b), 105(d), (e). Maher also "asserted that Plaintiff's continued employment at NJIT legitimized discredited ideas that have no place in academia" and "stated that Plaintiff was a proponent of racist ideology." *Id.* ¶ 105(c), (j).

These statements and implications are unverifiable opinion, and thus cannot result in defamation liability. *See Kotlikoff*, 444 A.2d at 1088. "Legitimized," "peddled," and being a "proponent of" do imply something factual, that Plaintiff promoted or supported certain theories. However, those alleged theories are "racism," "racial theories," "racist ideology," "pseudo-science," and "discredited ideas that have no place in academia." Falsely implying Plaintiff said racist things he never did may be defamatory, but here, the alleged implications are *characterizations* of Plaintiff's recorded statements. *See Ward*, 643 A.2d at 983 (instructing that even when a defendant implies a verifiably false fact (e.g., a false accusation of making racist statements), courts must still examine the context in which the statements were made to determine if they could undergird a defamation claim). As the current dispute demonstrates, what constitutes racism, pseudo-science, and discredited ideas is subject to intense debate and incapable of objective verification. Therefore, the accusations are properly understood as expressing Defendants' opinions that Plaintiff's recorded statements and theories are pseudo-science; racist; similar to those used to support slavery, Jim Crow laws, and the Holocaust; have been discredited; and have no place in academia. To hold otherwise, the Court would need to wade into what constitutes "racism" or "pseudo-science" and which ideas are "appropriate for academic debate." The parties can rest easy knowing that academic disagreement on such topics will not result in legal liability. Accordingly, the claims based on these characterizations contained in Counts Three and Five are **DISMISSED**.

The allegation in Count Five that Plaintiff "peddled racial theories equivalent to those underlying slavery, Jim Crow laws, and the Holocaust" is the closest call between fact and opinion. While "equivalent" technically means "equal," the content and context of the Maher

---

[3] That is not to say the Statements did not imply anything verifiably false. The Statements—including opinions about Plaintiff's fitness to teach—imply the views attributed to him in the Recording were accurately so attributed (i.e., mixed opinions implying the Recording's accuracy). That implication is capable of verification and is thus potentially defamatory. However, as already discussed, Plaintiff failed to adequately allege Defendants acted with actual malice in implying as such. *See supra* Part II.C.1.

7

Statement shows "equivalent" implied "similarity" or "parallels" to the ideas underlying the atrocities described. While the Court finds the accusation of similarity between two views—without more—an unverifiable opinion, Maher pointed to Plaintiff's published article, *Against Perennial Philosophy*, as evidence of the similarity. Compl. ¶ 49. Accordingly, the Court will analyze whether the claim should be dismissed assuming the alleged implication is factual.

The claim based on "impl[ying] that Plaintiff peddled racial theories equivalent to those underlying slavery, Jim Crow laws and the Holocaust" contained in Count Five should be dismissed because—assuming it is factual—it is true. *See DeAngelis*, 847 A.2d at 1267-68. In *Against Perennial Philosophy*,[4] Plaintiff asserts theories similar to those used to justify slavery and Jim Crow laws. For example, Plaintiff is certain that innate differences between the races dictate individual capabilities.[5] Further, according to Plaintiff, only Aryans are capable of apex-level human thought.[6] As to the Holocaust, Plaintiff argues:

> With the emerging technologies of embryo selection and genetic engineering, it would be possible, with the right leadership and government planning, to restore the pre-Arab and pre-Mongol genetic character of the majority of the Iranian population within only one or two generations. I'm sorry to have to suggest that this might be necessary in order to Make Iran Great Again.

---

[4] *Against Perennial Philosophy* is incorporated by reference in the Complaint and subject to judicial notice. Compl. ¶ 49; *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). While the Complaint denies peddling racial theories equivalent to those underlying slavery, Jim Crow laws, and the Holocaust, and plaintiffs' allegations are generally accepted as true, when a document incorporated in the complaint contradicts the allegations, courts may consider the document controlling. *See, e.g., S. Jersey Gas Co. v. Mueller Co., Ltd.*, No. 09-cv-4194, 2012 WL 12898818, at *3 (D.N.J. Jan. 30, 2012), *aff'd*, No. 12-1547, 2013 WL 870339 (3d Cir. Mar. 11, 2013).

[5] That Africans have an average IQ of around 75 whereas whites have an average IQ of around 100, and Africans who have mixed with whites (for example in North America or South Africa) have an average IQ of around 85 has to do not with education or social conditioning, but with different genetic inheritances from extinct Hominid species. . . .

The Arab-Muslim invasion was bad, but once this was compounded by the genocidal Turkic and Mongol conquests of Iran, a demographic shift took place that deprived Iran of the genetic basis for the production of a Hegel, Nietzsche, or Heidegger. Such men are less than one in a million, even in a genetically pure Aryan population.

Mot. Ex. A at 12-14.

[6] Nietzsche grasps the form of Zarathustra's thought and the ethos of this personality, an epitome of the "Promethean" or "Faustian" spirit characteristic of the Aryan genius long before Aeschylus' Prometheus or Goethe's Faust. This mentality has a genetic basis. You do not find it in Asians, Arabs, Africans, and other non-Aryan peoples. . . .

So if we ask why Iran never produced a Hegel after the Arab invasion, we have to remember that Hegel was German and not Greek.

*Id.*

8

*Id.* at 14. Advocating that the "right leadership and government planning," could restore the "genetic character" of a once-great nation through "genetic engineering" is similar to the theories used to justify the Holocaust. Thus, even assuming the implied equivalence between Plaintiff's philosophy and the theories underlying slavery, Jim Crow laws, and the Holocaust is a factual matter, it is true. As such, the associated claim in Count Five is **DISMISSED**.

### 4. Plaintiff is Full of Racism, Hate, and Bigotry; Is a White Supremacist; and Attribution of Plaintiff's Views to Prejudice and Power

In his fourth and fifth causes of action, Plaintiff alleges the Klobucar Statement (Count Four) "stated and implied that Plaintiff himself was full of racism, hatred and bigotry" while the Maher Statement (Count Five) "stated and implied that Plaintiff was a white supremacist" and "attributed Plaintiff's views to prejudice and power." Compl. ¶¶ 92(b), 105(b), (f).

As discussed above, "insults, epithets, name-calling, and other forms of verbal abuse, although offensive, are not defamatory." *Lynch*, 735 A.2d at 1137. Therefore, calling someone a racist, hater, or bigot—without more—will not result in defamation liability. *See id.* As there is no material difference between calling someone "racist" versus "full of racism," the allegations regarding the Klobucar Statement will not result in defamation liability. Similarly, calling Plaintiff a "white supremacist" is synonymous with calling Plaintiff "racist," and thus will not result in defamation liability. *Kotlikoff*, 444 A.2d at 1088. Therefore, claims based on the above-described statements and implications are **DISMISSED**.

As to the alleged "attribution" in Count Five, the Court is unsure what Plaintiff means in alleging Maher "attributed Plaintiff's views to prejudice and power." Compl. ¶ 105(f) "Attributed" could mean that Maher meant Plaintiff's views were "caused by" Plaintiff's prejudice and power, or the views themselves reflected prejudice and power. Under either reading, the alleged attribution is non-defamatory. Stating Plaintiff's views were caused by his prejudice is materially equivalent to saying Plaintiff is prejudiced. As already discussed, such insults are non-defamatory.[7] *See Lynch*, 735 A.2d at 1137. And stating the views themselves are "prejudice" is equivalent to asserting Plaintiff "peddled racism" or "racial theories." Just as those statements were non-actionable opinions, so are assertions that Plaintiff's views are prejudice.[8] *See supra* Part II.C.3. Therefore, claims based on Maher's attribution of Plaintiff's views to prejudice and power are **DISMISSED**.

### 5. Enthusiasm for the Redemption of Adolf Hitler

Count Five contains the only remaining allegation, that Maher "stated and implied that Plaintiff was . . . enthusiastic about the redemption of Adolf Hitler as a world leader." Compl. ¶ 105(b).

The Complaint does not plausibly allege Maher acted with actual malice in stating and implying Plaintiff was enthusiastic about the redemption of Adolf Hitler. As discussed above, with respect to matters of public concern, if a defendant did not act with actual malice, defamation claims fail as a matter of law. *See W.J.A.*, 43 A.3d at 1156. In the Recording,

---

[7] Implying Plaintiff's views were caused by his "power" is not defamatory either.

[8] Implying Plaintiff's views are "powerful" is similarly non-defamatory.

9

Plaintiff is depicted saying: "We will have a Europe, in 2050 where the banknotes have Adolf Hitler, Napoleon Bonaparte, Alexander the Great. And Hitler will be seen like that: like Napoleon, Like Alexander; not like some weird monster, who is unique in his own category. No, he's just going to be seen as a great European leader." Plaintiff does not allege that Maher knew the Recording had been edited *to misconstrue* Plaintiff's true beliefs before making the Statement. Thus, Maher had no reason to doubt the accuracy of the views attributed to Plaintiff in the Recording—i.e., excitement for Hitler's redemption. There is thus no plausible allegation that Maher acted with actual malice, *see supra* Part II.C.1, and claims based on the alleged enthusiasm about the redemption of Hitler are **DISMISSED**.

### D. <u>Prejudice</u>

Defendants move to dismiss with prejudice. While Plaintiff did not request leave to amend, even when a party does not seek leave, district courts should expressly state whether a party may replead. *See Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000). The decision is within the Court's discretion. *Id.* at 115. Leave will be denied in cases of "undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, amendment would be futile for the claims grounded in non-actionable opinions or epithets, or alternatively, true statements. *See supra* Part II.C.2-4. The Complaint includes the complete Statements and each alleged implication, and the Court finds them non-actionable as a matter of law. *See Kotlikoff*, 444 A.2d at 1088.

As to the claims dismissed for lack of malice, *supra* Part II.C.1, 5, Plaintiff *may* state a claim if he can allege additional facts regarding Defendants' knowledge at the time they made the Statements. Amendment is not necessarily futile because Plaintiff could add factual allegations suggesting Defendants knew the Recording misconstrued Plaintiff's views, yet implied the Recording was accurate nonetheless (i.e., acted with actual malice). *See Lynch*, 735 A.2d at 1135-36.[9] Therefore, Plaintiff is granted leave to amend as to the claims that Defendants falsely (1) "implied that the sensationalized views attributed to Plaintiff in the [Recording] were truly and accurately attributed to Plaintiff" and (2) "stated and implied that Plaintiff was . . . enthusiastic about the redemption of Adolf Hitler as a world leader." Compl. ¶¶ 66(a), 79(a), 92(a), 105(a)-(b).

For these reasons, Defendants' request to dismiss with prejudice is **GRANTED IN PART** and **DENIED IN PART**.

---

[9] Of course, any additional accusations must be made in accordance with the Federal Rules of Civil Procedure. *See* FRCP 11(b)(3) ("By presenting to the court a pleading . . . an attorney . . . certifies that to the best of [her] knowledge . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.") (c) (providing sanctions for violations of FRCP 11(b)).

## III. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss Counts Two through Five of the Complaint with Prejudice is **GRANTED IN PART** and **DENIED IN PART**. Counts Two through five are **DISMISSED**, but Plaintiff has **LEAVE TO AMEND** as set forth in Part II.D of this Opinion. An appropriate order follows.

Date: March 11, 2019

WILLIAM J. MARTINI, U.S.D.J.