**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JASON JORJANI,<br><br>       Plaintiff,<br>v.<br><br>NEW JERSEY INSTITUTE OF TECHNOLOGY, FADI P. DEEK, *et al*.,<br><br>       Defendants. | Civil Action Nos.:   18-11693 (WJM)<br>                                   20-1422 (WJM)<br><br>(CONSOLIDATED)<br><br><br>**OPINION** |

**FALK, U.S.M.J.**

These employment cases arise out of the non-renewal of Jason Jorjani's contract as a lecturer at the New Jersey Institute of Technology ("NJIT").   In the first case -- *Jorjani v. NJIT, et al.*, 18-11693 (WJM) ("*Jorjani I*") -- Plaintiff alleges a conspiracy by NJIT's President and NJIT's Dean for the College of Arts and Sciences to violate his First Amendment rights.   In *Jorjani II -- Jorjani v. Deek, et al.*, 20-1422 (WJM) -- Plaintiff expanded his theory to include a panoply of additional defendants, including NJIT trustees, department chairs, and attorneys. The cases are now consolidated.

Currently before the Court is an application by Plaintiff to compel the production of approximately 30 documents on the grounds of the crime-fraud exception to the attorney-client privilege, and an additional 14 documents alleging that any privilege that could exist either has not been established or has been waived.   The parties have fully briefed the matter, submitting

30-page briefs and supporting certifications and documents.[1]  The Court has considered the submissions and determined that oral argument is not necessary.  *See* Fed. R. Civ. P. 78(b).  For the reasons set forth below, Plaintiff's motion is **DENIED**.

## RELEVANT BACKGROUND

Plaintiff alleges a broad conspiracy involving much of NJIT's senior administration to terminate his employment as a lecturer for disfavored political speech and association in violation of his First Amendment rights.  Prior Opinions provide more detail.  *See, e.g.*, *Jorjani v. Deek*, 2020 WL 5422802 (D.N.J. Sept. 20, 2020); *Jorjani v. NJIT*, 2019 WL 2611128 (D.N.J. June 26, 2019); *Jorjani v. NJIT*, 2019 WL 1125594 (D.N.J. Mar. 12, 2019).  For purposes of this motion, it is enough to say that the parties have different views of what led NJIT not to renew Plaintiff's lecturing contract.  What follows is a basic description necessary to place this motion in proper context.

Jorjani's cases are essentially premised on the allegation that various members of the NJIT administration worked together to fabricate a pre-textual reason not to renew his lecturing contract because they did not approve of his speech and outside associations.  This alleged scheme focused on the completion and accuracy of what are referred to as Outside Activities Questionnaires ("OAQs"). OAQs are documents that NJIT employees must complete that disclose extracurricular activities for the purpose of ensuring that employees do not have impermissible conflicts and that they are not using university time and funds to work on other undisclosed projects that conflict with the employee's primary obligation to NJIT.

---

[1] The parties also have several additional discovery and case management disputes that do not involve privilege, which have been briefed separately.  Those disputes will be addressed by separate Opinion and Order in due course.

The papers describe Jorjani as possessing "Alt Right" beliefs. In 2006, it is undisputed that professors from in and outside the NJIT community had expressed concerns to the NJIT administration regarding Jorjani's associations and speech.[2] Thereafter, in March 2017, NJIT Professor Eric Katz, the Chair of Plaintiff's Department, became concerned that Jorjani was devoting time to a position as the editor-in-chief of Arktos Media, LLC – a publishing company – and that this position was not disclosed on his OAQ. After a discussion, in April 2017, Plaintiff amended his OAQ to identify his position with Arktos Media. In June 2017, after the OAQ was updated, Jorjani's lecturer's contract was renewed.

In September 2017, the New York Times ran a story about Jorjani alleging that he was the leader of an Alt-Right movement, had founded an entity described as an Alt Right Corporation, and shared pro-Hitler beliefs.[3] The NYT piece was accompanied by a video, which Plaintiff claims was deceptively "sliced and diced," to make him appear to be a Nazi-sympathizer, among other things. Following the NYT Op-Ed, Plaintiff was placed on paid administrative leave and NJIT retained Saiber, a New Jersey law firm, to investigate Plaintiff and his previously undisclosed relationship with the Alt-Right Corporation.

On February 9, 2018, Saiber issued a 40-page report. (Defs. Br. Ex. 4.) Saiber

---

[2] *See* Plaintiff's Brief at 6 (citing email from NJIT's Dean Belfied on December 5, 2006); 13 (citing email from Leslie Rogne Schumacher to NJIT Professor Katz on November 20, 2006; complaining about content of Jorjani off-campus speech); and 13 (email from Yale Professor Glenda Gilmore to NJIT's President "He [Jorjani]is currently a lecturer at your institution, teaching a course in "Technology and Human Values." His recent book promotes parapsychology, and he argues for genetic superiority of the white race. Since lecturers generally serve on one-year contracts, I curious to know if your institution will renew his contract for the next academic year?").

[3] *Undercover with the Alt-Right,* New York Times, Op-ed, September 19, 2017 (available at) https://www.nytimes.com/2017/09/19/opinion/alt-right-white-supremacy-undercover.html

–3–

concluded, among other things, that Plaintiff had intentionally misled NJIT regarding his outside activities; had violated OAQ requirements by failing to disclose his relationship with the Alt-Right Corporation; failed to disclose his actual interest in Arktos Media, which was that of the owner, not simply the "editor-in-chief"; and had canceled at least 13 classes without the knowledge or approval of his Department.  Following these revelations, based on the Saiber report's findings as well as other reasons,[4] Plaintiff's contract was not renewed.

Plaintiff contends that the OAQ process was essentially a set up from the beginning.  He claims from late 2016 onward, NJIT professors and higher administration were actively monitoring him and seeking to construct a method to fire him on account of his protected speech. In support of this theory, he cites the emails referenced, *supra* (*see* footnote 2) as well as a January 24, 2017 email between two NJIT attorneys – Attorneys Li and Stern - in which they were apparently discussing a case from Southern District of Florida, *Tracy v. Florida Atlantic University ("Tracy")*, that involved the termination of a Florida Atlantic professor for questioning the accuracy of the press coverage of the Sandy Hook massacre.  Plaintiff contends these emails (and others) are proof of an illicit conspiracy to terminate him and thus vitiate the attorney-client privilege.[5]

---

[4] This description is not meant to describe all of Defendants' reasons for not renewing Jorjani's contract.  Another reason, which is discussed in the papers but does not bear on the arguments in this motion, is that Defendants contend that Jorjani's speech had caused and would continue to cause extreme disruption to the NJIT learning environment, invoking *Pickering v. Bd of Ed. of Twp. High Sch. Dist.*, *Will Cty. Illinois*, 391 U.S. 563 (1968) (allowing State to evaluate impact of employee speech to determine whether speech is so disruptive as to prevent employee from functioning in the work environment).

[5] Again, this background section is limited to what is necessary to decide this motion. Defendants' papers discuss at length the fact that Jorjani had a year-to-year contract, did not have tenure, was not a professor, and had no entitlement to continued employment.  Whether true or

## **LEGAL STANDARD**

**The Attorney-Client Privilege**

The attorney-client privilege is the client's right to refuse to disclose confidential communications between attorney and client made for the purpose of obtaining legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). It exists to promote the public interest in "the observance of law and the administration of justice," *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991), which is accomplished by encouraging "full and frank communications between attorneys and their clients." *Upjohn*, 449 at 389. The privilege applies only if:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made
> (a) is a member of the bar of a court, or his subordinate and
> (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir. 1979).

The privilege is an exception to the rule of full disclosure and obstructs the truth finding process, thus it is narrowly construed. *See Westinghouse Elec. Corp.*, 951 F.2d at 1423. It protects only those communications that would not have been made but for the privilege. *See Fisher v. United States*, 425 U.S. 391, 403 (1976). Application of the privilege is decided on a case-by-case basis with the party asserting privilege bearing the burden to show it applies. *See*

---

not, these are merits issues that are disputed and are to be decided at a different time.

*e.g.*, *In re Bevill, Bressler & Schulman Asset Mgmt.*, 805 F.2d 120, 124 (3d Cir. 1986).

In determining whether the privilege applies in each case, the ultimate question is whether a "communication is one . . . made. . . for the purpose of obtaining legal advice or services." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805 (Fed. Cir. 2000).

**The Crime-Fraud Exception**

The crime-fraud exception to the attorney-client privilege is the concept that the privilege does not protect any communications between an attorney and client that are intended to further a crime or fraud. *United States v. Doe*, 429 F.2d 450, 454 (3d Cir. 2005). The crime-fraud exception only applies to an ongoing or future contemplated action. It is obvious that clients are permitted to get legal counsel to defend any wrong they have done in the past. However, the privilege is also not lost if the client "innocently proposes an illegal course of conduct to explore with his counsel what he may or may not do." *Id.* Only when a client "knowingly seeks legal counsel to further a continuing or future crime does the crime-fraud exception apply." *Id.*

As discussed below, a party seeking to invoke the crime-fraud exception must first make a *prima facie* showing that a crime or fraud has occurred. It seems clear that mere allegations are not sufficient. There must be a showing that the attorney's advice was sought in furtherance of the crime or fraud and that the client intended to commit the crime or fraud at the time of the communication. One commentator notes that some courts refer to a prima facie showing, while others talk in terms of probable cause, or reasonable basis. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine, p. 697 (5th Ed. 2003). The point is some proof of wrongdoing must be shown. Mere allegations will not suffice.

The crime-fraud exception to the privilege is a two-step process with the burden always

–6–

resting with the party seeking to pierce the privilege. The first step may involve an *in camera* inspection of the disputed communication. The second step is breaking the privilege and finding that the crime-fraud warrants disclosure of otherwise privileged communications. These two steps come with different burdens on the party seeking to invoke the exception.

> **First**, to warrant an *in camera* inspection:
>
> Before engaging in an in *camera* review, a plaintiff must show "a factual basis adequate to support a good faith belief by a reasonable person ... that in *camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Haines v. Ligget Group*, 975 F.3d at 96 (citing *United States v. Zolin*, 491 U.S. 554, 572 (1989)).

*Speth v. Goode*, 2013 WL 3412050, at *5 (D.N.J. July 3, 2013).

> **Second**, to pierce the privilege based on the crime-fraud exception:
>
> [A] stricter standard is required to establish that the crime/fraud exception applies to actually pierce the attorney client privilege and to compel the discovery materials to be turned over to adverse counsel. Specifically, "the party seeking discovery must present evidence which, if believed by the factfinder, would be sufficient to support a finding that the elements of the crime/fraud exception were met." *Haines,* 975 F.3d at 96. The Third Circuit has recently clarified this standard and explained:
>
>> Where there is a reasonable basis to suspect that the privilege holder was committing or intending to commit a crime or fraud and that the attorney-client communications or attorney work product were used in furtherance of the alleged crime or fraud, this is enough to break the privilege. The reasonable basis standard "is intended to be reasonably demanding; neither speculation nor evidence that shows only a distant likelihood of corruptions is enough."
>
> *In re Grand Jury*, 705 F.3d 133, 153 (3d Cir. 2012).

*Id*. (certain internal quotes and cites omitted).

A court's analysis proceeds in these stages, and if a party cannot establish a *prima facie* case at stage one, the proceedings are over, and the privilege is upheld. *See, e,g.*, *Wachtel v. Guardian Life Ins. Co.*, 239 F.R.D. 376, 379 (D.N.J. 2006).

–7–

**DISCUSSION**

Plaintiff's motion is primarily about the crime-fraud exception, which is why the Court has set forth that standard expressly above. Thereafter, there are several secondary arguments relating to, for example, whether the privilege has been established at all, and if it has, whether it was waived. In order to decide the application in the way it was presented, the Court proceeds to address the crime-fraud question first, followed thereafter by consideration of Plaintiff's additional privilege and waiver arguments. As is set forth below, the Court finds that there is no basis whatsoever to invoke the crime-fraud exception, and that Plaintiff's additional arguments regarding privilege, including waiver, are not convincing. For those reasons, the motion is **DENIED**.

**I.    The Crime-Fraud Exception Has Not Been Established**

There is no basis for application of the crime-fraud exception in this case. As is explained below, Plaintiff is attempting to invoke the crime-fraud exception without any evidence and based solely on the assumption that his view of the events is true. It is the definition of a chicken-and-egg situation. Stated differently, Plaintiff has made allegations, contends the allegations are true, proceeds as though they are proven, and then seeks to retroactively establish a crime or fraud necessary to invade the privilege. Of course, privilege does not work this way. Plaintiff has presented no proof of wrongdoing, simply bare allegations which are forcefully denied. Plaintiff's application woefully fails for many reasons, some of which are described below.

**First**, Jorjani does not even allege activity that would constitute a crime or fraud sufficient to pierce any privilege. This is essentially an employment case, in which plaintiff

claims he was not renewed for an illegal reason. In that way, it is comparable to all employment cases. He couches his allegations as a civil conspiracy, which would be a tort, but cites no binding case law that suggests that even if a tort occurred would it warrant piercing the privilege. That alone is enough to deny the motion. Applying the crime-fraud exception is a "extreme remedy." *Unigene Labs v. Apotex, Inc.*, 655 F.3d 1352, 1359 (Fed. Cir. 2011). No Third Circuit Court of Appeals case law has been cited that has supported piercing the attorney-client privilege based on unproven allegations of a tort in a civil case. To the contrary, case law suggests otherwise. *See, e.g.*, *Speth,* 2013 WL 3412050, at *7 (Simandle, Chief Judge) ("[g]athering possible evidence of a tort . . . is not a sufficient basis to conduct an *in camera* review or to trigger the crime-fraud exception to the attorney-client privilege."), aff'd *Speth v. Goode*, 607 Fed. Appx. 161, 165 (3d Cir. 2015); *see also Tighe v. Buschak*, 11-224, Slip Op. at 4 n.1 (W.D. Pa. July 5, 2013)[6] (McLaughlin, Chief Judge) ("Although several opinions from the Court of Appeals for the Third Circuit refer, generally, to the exception's applicability to 'torts', none actually apply the exception in a civil case in which a tort is alleged.") (citing *Doe*, 429 F.3d at 454); *In re Impounded*, 241 F.2d 308, 316 (3d Cir. 2001); *In re Grand Jury Proceedings*, 604 F.2d 798, 802 (3d Cir. 1979) & *Handbook of Fed. Evid.*, § 503.7 (7th ed.)(("The exception does not extend to communications between client and lawyer in furtherance of a tort") (citing *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir. 1995), *cert. denied*, 517 U.S. 1190 (1996))).

**Second**, the sole basis for Jorjani's attempts to invoke the crime-fraud exception is his

---

6 The *Tighe* Opinion was supplied to the Court on October 23, 2020, as part of Defendants' Opposition submission.

own narrative of the facts unsupported by any evidence. Plaintiff has pleaded a case alleging a conspiracy to terminate his employment. Defendants have disputed it, and Plaintiff effectively contends that because his version of the events is true, he should be permitted to pierce the attorney-client privilege to fish for information to support it. That is not how this works. Plaintiff's alleged conspiracy and his version of the events are hotly disputed. It is the issue to be decided in the case. Simply alleging a scheme involving wrongdoing does not form a basis for even an *in camera* review, let alone piercing the privilege. *See Tighe*, 11-224, at *4 (declining to apply crime-fraud exception when fact dispute "went to the heart of the case").

In order to even qualify for the first step – an *in camera* review – Plaintiff must come forward with evidence sufficient for a reasonable person to believe that a crime or fraud has occurred. *See Haines,* 975 F.3d at 96. For that reason, in cases where the crime-fraud exception is successfully invoked, it is generally *after* it has been established that wrongdoing has occurred, not based on allegations in a case. *See, e,g.*, *Wachtel v. Guardian Life Ins. Co.*, 239 F.R.D. 376, 379 (D.N.J. 2006). Plaintiff has not established any wrongdoing has occurred nor has he provided a hint of any that would warrant an *in camera* inspection; instead, he has held up a few emails and cited his version of the events and claimed that this destroys the attorney-client privilege. This complete failure of proof means that Plaintiff has not met step one – justification for an *in camera* review – and the inquiry is over. *See Wachtel*, 239 F.R.D. at 379.

**Third**, piercing the privilege here would have dramatic consequences. Counsel are employed by NJIT for the purpose of, among other things, providing employment advice in employment circumstances. So long as a lawyer's advice does not further a crime or fraud, they

–10–

are doing their *jobs* when they advise their client about the state of the law and/or what NJIT's options are; the fact that Plaintiff may not like what occurred with respect to the renewal of his contract does not automatically transform any attorney client communications or advice into the aiding or abetting of a crime. A different result would allow any dissatisfied Plaintiff to file a Complaint alleging a "pretext" and then gain access to any privileged communications leading up to termination. If that were approved, it would have a staggering effect on the practice of employment law. For example, most employee plaintiffs allege they were wrongfully terminated for an illegal reason. Most defending employers proffer a purportedly legitimate, legal reason for the termination. The plaintiff then contends that the employer's proffered reason is actually a pretext for an illegal action. These are the contours of almost every employment case—a paradigm described in the impactful case *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the case survives summary judgment, it is for the trier of fact to decide whether the employer's conduct was illegal. The mere allegation of pretext, or bad intent, could never dissolve the attorney-client privilege.

**Fourth**, Plaintiff argues at length that he was treated disproportionally from other NJIT employees who did not accurately complete or update their OAQ and that he was unfairly monitored and scrutinized. The Court fails to see how this has anything to do with the crime-fraud exception to privilege. Those are arguments for the full case and the merits.

In short, Plaintiff has provided no information that would warrant an *in camera* inspection of any communications for possible production pursuant to the crime-fraud exception. He has a view of the facts: he was monitored, subject to pretextual termination, and disproportionate treatment. Defendants have theirs: Plaintiff was dishonest and deceptive, failed

–11–

to disclose outside activities, violated NJIT standards in many ways, and could not continue employment in all events under the balancing test set forth in *Pickering*. That is the case. And it cannot be litigated through the prism of the crime-fraud exception, which as Plaintiff presents it would require the Court to assume that his version is true. And all that said, even Plaintiff's version were true, there is still nothing alleged that constitutes a crime or fraud that would warrant piercing the privilege.

Plaintiff's application monumentally fails to establish any basis to apply the crime-fraud exception in this case.[7]

## II.     Additional Privilege Issues – Establishing Privilege & Waiver

Plaintiff also claims that 14 documents must be produced because privilege has not been established and/or any protection has been waived.[8]  The Court disagrees.

Generally, the voluntary disclosure of an attorney-client communication to a third-party waives the attorney-client privilege.  *See United States v. Rockwell Int'l*, 897 F. 1255, 1265 (3d Cir. 1990).  The party asserting privilege bears the burden to establish that it has not been waived.  *See, e.g.*, *La. Mun. Police Corp. v. Sealed Air*, 253 F.R.D. 300 (D.N.J. 2008).  When the question turns to whom within a company or institution qualify for privilege protection,

---

[7] In a puzzling argument, Plaintiff claims that because of Defendants' "bad intent" the privilege should also be waived as to Defendants' communications with current defense counsel defending this case.  This argument is frivolous.  Even if some kind of crime or fraud occurred before this case was filed – and it has not been shown at all to be the case – Defendants are entitled to defend themselves.  There is no basis whatsoever to invade Defendants' privilege with their current litigation counsel.

[8] Plaintiff appears to claim that the privilege has not been established and/or has been waived because Defendants did not support their privilege log with an affidavit. (Pl.'s Br. 5.) This is simply wrong. There is no requirement that an affidavit accompany a privilege log. *See* Fed. R. Civ. P. 26(b)(5)(A).

"sharing documents amongst corporate employees does not necessarily vitiate a privilege; rather communications remain privileged if they assist the attorney to formulate and render legal advice." *Margulis v. Hertz Corp.*, 2017 WL 772336, at *8 (D.N.J. Feb. 28, 2017). In other words, "the privilege protects communications with those that must be consulted in order for a lawyer to provide legal advice – i.e., those that "need to know" or have information necessary to assist the lawyer . . . ." *Id.*[9]

The parties refer to 14 documents, and the Court addresses them as they have been presented. In doing so, it should be noted that for many of these documents, Plaintiff's argument is limited to one paragraph stating that the emails were copied to "third parties" or people who are not in NJIT's control group. The argument is sparse and made primarily on a generalized basis, with only limited document-by-document argument. *See* Pl.'s Br. 7 (one paragraph; generalized argument); Pl.'s Reply 6-7 (limited specific document argument).

- *Log Entries 214 and 220*: These entries are emails between and among various members of NJIT's upper administration. All the individuals on these emails were named as Defendants in one iteration of Plaintiff's Complaint or another. And Defendants make clear that

---

9 The papers contain sporadic references to the attorney work-product doctrine. Detailed argument on same has not been made and the standard and elements not successfully applied in the papers. Nevertheless, for purposes of completeness, attorney-work product doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 661-62 (3d Cir. 2003); *see also* Fed. R. Civ. P. 26(b)(3). Attorney work-product protection is waived only if a disclosure enables an adversary to gain access to the information. *See Sealed Air*, 253 F.R.D. at 311 (citing, *inter alia*, *Maldonado v. New Jersey*, 225 F.R.D. 120, 132 (D.N.J. 2004) ("The essential question with respect to waiver of the work-product doctrine by disclosure is whether the material has been kept away from adversaries.")). The burden of establishing waiver of the work-product doctrine falls, unlike the attorney-client privilege, on the party seeking to establish waiver. *See id*.

all these individuals are part of their litigation control group and were involved in communications necessary to support the provision of legal advice to NJIT.  Nothing more is needed to sustain the privilege.  The privilege protects communications within an entity – like NJIT – when the recipient "needs to know" or has information necessary to assist the lawyer. *See Margulis*, 2017 WL 772336, at *8.  As each of these individuals were named as Defendants by Plaintiff himself, it would make sense that their communications would be protected by the applicable privilege.

- *Log Entries 275 and 276*:   These emails are clearly privileged.  The first is from NJIT Counsel Christine Li to David Ullman, NJIT's Chief Information Officer, and Cathy Aveta, a member of Saiber's legal team.  The second is from Ms. Li to Mr. Ullman on the same subject. These emails on their face are between and among counsel and people that "need to know" or have information necessary to the provision of legal advice.  For the same reasons the first two emails are protected, these are as well.

- *Log Entries 323 and 324*:   These are emails between NJIT's General Counsel, Holly Stern, and a Humanities Professor at NJIT.  Defendant explains that the purpose of these emails was fact gathering that was ongoing during Plaintiff's paid leave and done with the expectation of possible litigation.  As such, they are protected attorney-work product.  Plaintiff provides no countervailing reason why these emails should be produced.

- *Log Entries 375-377*:   These are a series of emails between and among members of NJIT's litigation control group and NJIT's General Counsel.  Contrary to Plaintiff's argument that these recipients were not in NJIT's control group, all but one of the email participants were named as Defendants in these cases.

–14–

- *Log Entries 380, 385, 393-395*: These emails are a thread running from February 9, 2018 to February 12, 2018, and are represented to be communications from a Professor to NJIT's General Counsel, Ms. Stern, and Ms. Stern's response, providing legal advice requested. As such, they are privileged. The inclusion of other members of NJIT on the emails – members who later became Defendants in the case – are not a basis for waiver of the privilege. *See Margulis*, 2017 WL 772336, at *8 ("sharing documents amongst corporate employees does not necessarily vitiate a privilege; rather communications remain privileged if they assist the attorney to formulate and render legal advice.").

- *The January 24, 2017 Email*: This email is between NJIT attorney Ms. Li and NJIT's General Counsel, Ms. Stern. Plaintiff's objection is that Defendants' current counsel initially listed attorney work product as a basis to withhold the document, and only added the attorney-client privilege later, when serving an amendment to the privilege log. Plaintiff claims that this amounts to waiver of the privilege. Not so. As Defendant notes, the Discovery Confidentiality Order in this case has a provision covering accidental disclosure of privileged information. *See* ECF No. 35; Discovery Confidentiality Order, ¶ 12. Technical attorney error quickly corrected does not waive the privilege. Given that the email is between two attorneys and discussing legal issues, it is clearly privileged. It also qualifies for work-product protection as a conversation about plausible future litigation.

## **CONCLUSION**

For the reasons set forth above, Plaintiff's application is **DENIED** in its entirety.   An appropriate Order will be entered.

                                                     s/Mark Falk
                                                     **MARK FALK**
                                                     **Chief U.S. Magistrate Judge**

**DATED:   January 11, 2021**