# KATZ DEPOSITION EXCERPTS

```
1      A    Frankly, I have no memory of the actual
2  conversation with Belfield, when it took place that
3  week, where it took place.  So I can't really say.
4  But my -- I'm almost 100 percent sure that nobody else
5  would've been in the room.
6           When I had conversations with Dean Belfield
7  in general about policy matters in the department of
8  humanities, it was almost always just him and me in
9  his office.
10     Q    Were you seeking legal advice from Dean
11 Belfield?
12     A    Absolutely not.  I was just telling him what
13 was going on and asking him what we should do about
14 it.
15     Q    At any point in time from November 2016, on,
16 when you addressed Dean Belfield with an issue
17 concerning Jason Jorjani, were you seeking legal
18 advice?
19          MR. HAEFNER:  Is Dean Belfield some
20 crypto lawyer that I'm unaware of?
21          MR. KELLY:  Listen, it's a question.
22          MR. HAEFNER:  You can go ahead and
23 answer.
24          THE WITNESS:  No.  I mean, my father
25 was an attorney.  If I want legal advice, I'm going to
```

```
                                                      Page 37
 1   ask a lawyer, not the dean.
 2   BY MR. KELLY:
 3       Q    Thank you, Professor Katz.
 4       A    My chair just went down.  Sorry.  Excuse me.
 5       Q    All right.
 6       A    I have to change chairs.
 7            MR. ROTH:  Or you could just move the
 8   screen.
 9            THE WITNESS:  Yeah, yeah, yeah.  Well,
10   I don't -- Rich, I don't know why your chair just
11   collapsed on me.
12            MR. ROTH:  You broke one.
13            THE WITNESS:  Okay.
14   BY MR. KELLY:
15       Q    Professor Katz, I'm going to show you what
16   I'd like marked as Plaintiff's Exhibit Number 13.  It
17   is an email trail; the head of which starts with
18   Matthew Golden, dated December 8, 2016, to Denise
19   Anderson.  It is marked as NJIT ESI Production Number
20   4898 through 4903.
21            (Exhibit 13 was marked for
22             identification.)
23       A    Okay.
24       Q    Do you see that?
25       A    Yeah.  You spelled --
```

Page 51

1    Q    Would it not have been much simpler to
2    simply craft a one or two-line sentence suitable to
3    release whenever NJIT received an inquiry like Mr.
4    Jinkins' or Mr. Schumacher's that stated, in effect,
5    our personnel or employees' politics are their own,
6    and if they're not brought to campus, they're not our
7    business?
8              MR. HAEFNER:  Objection to the form of
9    the question.
10             You can go ahead and answer.
11             It's ambiguous, but that's the basis of
12   the objection.
13             You can go ahead and answer.
14   A    I mean, again, it's not my place to decide
15   those kinds of things.  So the school could do
16   whatever they want.
17   Q    Well, surely as chairman of the department
18   of humanities, you felt some responsibility for
19   safeguarding the academic freedom of those within your
20   employ, correct, Professor Katz?
21             MR. HAEFNER:  Objection to the form of
22   the question.  Badgering.
23             You can go ahead and answer.
24             MR. KELLY:  Badgering?
25   A    Yes.

1  Q   And you were uneasy with Mr. Schumacher's
2  email, correct?
3       MR. HAEFNER: Was that the previous
4  email, Exhibit 12?
5       MR. KELLY: Yes.
6       MR. HAEFNER: Sorry. Thank you.
7       THE WITNESS: Uneasy? Yeah. It
8  created concern on my part, yes.
9  BY MR. KELLY:
10 Q   Was it uneasy for Jorjani's sake, or for
11 someone else's sake?
12      MR. HAEFNER: Objection to the form of
13 the question. Compound.
14      You can go ahead and answer.
15 A   I was concerned for Jason and for the
16 university.
17 Q   Professor Katz, when you wrote on December
18 8, 2016, here on Exhibit 13, someone needs to tell me
19 what to do and say --
20 A   Uh-huh.
21 Q   -- did you view this really as a PR problem?
22 A   Yes.
23      MR. KELLY: Gentlemen, we've been at
24 this for an hour. I'd like a five-minute break to
25 rest my eyes.

Page 52

1  Q    And you were uneasy with Mr. Schumacher's
2  email, correct?
3       MR. HAEFNER:  Was that the previous
4  email, Exhibit 12?
5       MR. KELLY:  Yes.
6       MR. HAEFNER:  Sorry.  Thank you.
7       THE WITNESS:  Uneasy?  Yeah.  It
8  created concern on my part, yes.
9  BY MR. KELLY:
10 Q    Was it uneasy for Jorjani's sake, or for
11 someone else's sake?
12      MR. HAEFNER:  Objection to the form of
13 the question.  Compound.
14      You can go ahead and answer.
15 A    I was concerned for Jason and for the
16 university.
17 Q    Professor Katz, when you wrote on December
18 8, 2016, here on Exhibit 13, someone needs to tell me
19 what to do and say --
20 A    Uh-huh.
21 Q    -- did you view this really as a PR problem?
22 A    Yes.
23      MR. KELLY:  Gentlemen, we've been at
24 this for an hour.  I'd like a five-minute break to
25 rest my eyes.

Page 92

1   probably just sent it on upstairs, as I was doing with
2   every other email.
3       Q   Professor Katz, when you say you sent it on
4   upstairs, does that mean sending it also on to Holly
5   Stern?
6               MR. HAEFNER:  Objection to the form of
7   the question.
8               You can go ahead and answer.
9       A   Again, at this point, I don't remember who I
10  was sending things to or who was on the email chain.
11  My primary -- I primarily sent it to Kevin Belfield,
12  the dean.  At this point, I don't remember whether
13  Matt Golden and Holly Stern and Fadi Deek were also on
14  the email chains.  I just don't recall.
15      Q   Professor Katz, in your mind, was this a
16  personnel matter, or was this a legal matter?
17              MR. HAEFNER:  Objection to the form of
18  the question.
19              You can go ahead and answer.
20              And can you repeat that?  Was this a
21  what or what?
22      Q   Sure.  Did -- let me rephrase it.
23              Did the Jorjani situation that was presented
24  to you in November of 2016 and onward -- by which I
25  mean various people complaining about Jorjani's

Page 93

1  extramural political speech and associations. Do you
2  understand that?
3      A    Yeah. Yes, I do.
4      Q    Did that situation, in your mind, present a
5  personnel issue, or a legal issue?
6      A    Well, I'm not a lawyer, so I don't think I
7  would consider it as a legal issue. To me it seems to
8  be more of a personnel issue.
9      Q    I'm going to show you what should be marked
10  as Plaintiff's Exhibit Number 30.
11      Let me pull it up.
12      (Exhibit 30 was marked for
13      identification.)
14      It's an email from Matthew Golden to
15  yourself, amongst other people, dated April 9, 2017.
16      A    Okay.
17      Q    The subject says Media Inquiry. It's a
18  two-page PDF. It's New Jersey -- NJIT's ESI Number
19  169 and 170.
20      Do you see that document, sir?
21      A    Yes, I do.
22      Q    Now, if you had a chance to read through it
23  or need me to scroll down, let me know, please, all
24  right?
25      Counsel, would you like me to scroll up?

Page 102

1  OAQ. I mean with regard to your interactions with
2  Jorjani.
3              MR. HAEFNER:  That he was in compliance
4  ethically?
5     Q    My question is -- let me see if I can
6  restate it.  I'll withdraw it and restate it.
7              Professor Katz, did you rely upon Christine
8  Li to be sure that you stayed within the law in terms
9  of your demands to have Jorjani fill out his OAQ form?
10             MR. HAEFNER:  Objection to the form of
11  the question.
12             If you're asking him if he had
13  conversations with Christine Li for legal advice in
14  her capacity as a lawyer, I'm instructing the witness
15  not to answer.  If you're asking him if he had
16  conversations with her as an ethics liaison officer
17  about ethical issues and interpretation of ethical
18  issues, he can answer.
19             MR. KELLY:  Well, in point of fact, I
20  think he'd have to answer both of those.  If
21  he's -- whether or not he's had conversations with a
22  lawyer, that itself is not a privileged question.
23             MR. HAEFNER:  Yeah, but you built into
24  the question what the topic of the conversation was
25  which is privileged.

1           MR. KELLY:  Well, hold on.  No, that's
2  not true.  The subject of the conversation is not
3  privileged.
4           MR. HAEFNER:  I think you -- why don't
5  you ask it again, because I think you built in what
6  was the advice of the lawyer.  But why don't you ask
7  it again.  Maybe you --
8  BY MR. KELLY:
9      Q   No, no.  Let me be clear.  Let me be clear.
10 I'm not asking what the specific advice is.  My
11 question was -- the verb was rely.
12          Did you rely upon the advice of Christine Li
13 to make sure that -- did Professor Katz rely upon the
14 advice of Christine Li to make sure that he was in
15 compliance with the law in his dealings with Jason
16 Jorjani on the OAQ issue?
17          MR. HAEFNER:  Do you want a yes or no
18 answer?
19          MR. KELLY:  Yes.
20          MR. HAEFNER:  It lacks foundation.  He
21 can give a yes/no answer.
22          Go ahead, Eric.
23          THE WITNESS:  My answer would be no.  I
24 never even considered my own legal position in terms
25 of Jason's OAQ.

Page 104

1  BY MR. KELLY:
2      Q    So, Professor Katz, is it fair to say that,
3  in your mind, this was strictly a -- strike that.
4           Professor Katz, is it fair to say that, from
5  your perspective, this was a run-of-the-mill personnel
6  issue?
7           MR. HAEFNER:  Objection to the form of
8  the question.
9           You can go ahead and answer.
10     A    Well, I wouldn't call it run-of-the-mill but
11 it was definitely a personnel issue.
12     Q    Professor Katz, was Jason Jorjani's OAQ
13 compliance a personnel issue?
14          MR. HAEFNER:  Objection to the form of
15 the question.  Asked and answered.
16          You can go ahead and answer.
17     A    Yes.  I believe it was a personnel issue.
18     Q    I'm sorry.  My -- by the way, I apologize,
19 Professor Katz.  I know a lot of this seems tedious.
20     A    That's okay.
21     Q    It's just kind of the way sometimes we work
22 things out.  I'm not trying to badger you or draw this
23 out.  It just -- when Mr. Haefner objects, I've got to
24 think about the matter and then try to reformulate in
25 case there's a valid objection there.  It's kind of

Page 105

1  the dance we do here.  I'm not trying to be tedious or
2  beat a dead horse as they say.
3      A    I understand.
4      Q    Okay.  Did you think, Professor Katz, that
5  Jorjani's OAQ issue was a particularly complex
6  personnel issue?
7           MR. HAEFNER:  Objection to the form of
8  the question.
9           You can go ahead and answer.
10     A    No, I didn't think it was complex.  I
11 thought that it was that he was not putting in all the
12 information relevant to his outside activities.
13 Pretty simple.
14     Q    Professor Katz, do you recall drafting a
15 reappointment letter with regard to Professor Jorjani
16 around April of 2017?
17     A    Yes, I do.
18     Q    Okay.  Did that present any kind of legal
19 issue in your mind?
20     A    No, it didn't.
21     Q    It presented a routine personnel issue,
22 correct?
23          MR. HAEFNER:  Objection to the form of
24 the question.
25          You can go ahead and answer.

```
                                                    Page 109
 1   what this email is about?
 2       A    No --
 3              MR. HAEFNER:  You can answer yes or no.
 4       A    No.
 5       Q    I'm going to have to ask -- well ...
 6              MR. HAEFNER:  Are you going to ask him
 7   to remember?  He just said he doesn't remember.
 8              Oh, and what document -- is this
 9   Exhibit 28, Mr. Kelly?  32?
10              MR. KELLY:  32.
11              MR. HAEFNER:  Okay.
12              MR. KELLY:  It's ESI -- NJIT's ESI
13   3678.  Marked confidential despite the fact that it
14   doesn't really reveal too much.  Probably another
15   overclassification by your office, but we'll let that
16   slide.
17              MR. HAEFNER:  Thanks.
18   BY MR. KELLY:
19       Q    Let me ask you this, Professor Katz.
20              In April of 2017, were you discussing
21   Jorjani's OAQ compliance with Holly Stern and
22   Christine Li?
23              MR. HAEFNER:  Objection to the form of
24   the question.  I mean, again, you built into the
25   question the nature of --
```

Page 110

1    MR. KELLY: The subject matter. I'm
2    not building into the nature of the advice, if any.
3    I'm asking the subject matter.
4    MR. HAEFNER: I don't believe that's
5    the truth, Mr. Kelly. I believe the
6    question -- there's a different question you could ask
7    and it's not that question.
8    So, you know, if you want to ask the
9    witness if he had conversations with Holly Stern
10   around this time, without discussing the topic, that
11   would initially get you an answer to your question and
12   we could see whether there's anywhere to go.
13   MR. KELLY: No, I'll stand on that
14   question. Are you going to direct him not to answer?
15   MR. HAEFNER: Okay. Don.t answer the
16   question, Mr. Katz.
17   MR. KELLY: Please mark that for a
18   ruling. I'll have that certified.
19   MR. HAEFNER: I don't even know what
20   that means. You know, we're in federal court in New
21   Jersey. There's no such thing as getting things
22   certified.
23   MR. KELLY: My experience in federal
24   court means, when it's certified, the judge rules on
25   it later on. That's what I mean --