*Frederick C. Kelly*

*Attorney at Law*
*One Harriman Square*
*Goshen, New York*
*845 294-7945 ◆ Fax 845 294-7889*
*fckellylaw@protonmail.com*

Honorable Jessica S. Allen
United States District Court Magistrate Judge
Martin Luther King Building
& U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

Re:     Jorjani v. NJIT, et al.
Civil Case No. 18-cv-11693

September 12, 2022                      *Via ECF*

Dear Judge Allen:

Defense Counsel takes the position that implied waiver under advice of counsel only occurs by disclosure of an attorney client communication, *e.g.*:

> But, importantly, as previously held by the Third Circuit in the seminal Rhone-Poulenc case, the advice of counsel is only "placed in issue" when the client "asserts a claim or defense and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Defense Letter Brief dated August 29, 2022, p.7.*

> Thus, the "key element in 'at issue' waiver is that the client has affirmatively put the attorney's advice at issue by disclosing an attorney-client communication. *Id. pp. 10-11.*

> …to waive the privilege, the defendant must describe the specific advice and rely on that advice as an essential element of a claim or defense. *Id. p. 12.*

> Absent a specific invocation of advice of counsel, or the deponent specifically describing the advice, no waiver occurs. *Id. p. 22.*

1

But if that is the correct test for implied waiver, then what is the test for explicit waiver?  Put differently, how would the test for explicit waiver differ from implied waiver?

The answer is: it would not.  Defense Counsel is urging the exact same test for both explicit waiver and implied waiver.  It appears that Defense Counsel were not always so confused about the two tests.  Consider their position before Judge Hillman just a few years ago: "As [*Defense Counsel Walsh Pizzi states*], explicit waiver occurs when there is a 'voluntary relinquishment of a privileged communication by a holder of the privilege to someone not a party to the privilege.'"  *FastShip, LLC v. Lockheed Martin Corp.*, 2019 U.S. Dist. LEXIS 160393, *12[1].

Defense Counsel's position here is plainly wrong.  Disclosure of an attorney client communication is not the key factor under implied waiver analysis, as it is where explicit waiver is the issue.  One of the leading cases in this circuit makes this clear: there was no prior disclosure of any attorney client communication in *Livingstone v. North Belle Vernon Borough*, 91 F.3d 515 (3rd Cir. 1996).  Instead, Mrs. Livingstone only asserted that she did not appreciate the legal significance of a release, which assertion the court found was "tantamount to a claim that her attorney did not give her accurate legal advice." *Id* at. 537.  Thus, "It would be unfair to allow her to make this claim without permitting the opposing parties to investigate her attorney's version of the relevant events." *Id*.

---

[1] Citing *to Margulis v. Hertz Corp.*, 2017 U.S. Dist. LEXIS 28311, at *15 (D.N.J. Feb. 28, 2017), *in turn citing In re State Com. of Investigation Subpoena Number 5441*, 226 N.J. Super. 461, 544 A.2d 893 (N.J. Super. Ct. App. Div. 1998)), *in turn citing United States v. Zolin,* 809 F.2d 1411 (9th Cir.1987).

Nor was there an attempt to disclose an attorney client communication in *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir. 1991), *cert. denied*, 502 U.S. 813 (1991), a Second Circuit case that has repeatedly been invoked by the Third Circuit, e.g. *Livingstone v. North Belle Vernon Borough* at 537; *see also, United States v. Riley*, 621 F.3d 312, 333 (3rd Cir. 2010). On the contrary, Mr. Bilzerian contended (like Defendants here) that the "testimony he sought to introduce regarding his good faith attempt to comply with the securities laws would not have disclosed the content or even the existence of any privileged communications or asserted a reliance on counsel defense." *Id*. at 1291. Nevertheless, the *Bilzerian* court held that such testimony would have worked an implicit waiver. *Id*. at 1292.

Instead, implied waiver analysis is much more nuanced (as implicit things usually are). It concerns whether the "client has asserted as a material issue in a proceeding that… the client acted upon the advice of a lawyer or that the advice was otherwise relevant to the legal significance of the client's conduct." *Livingstone v. North Belle Vernon Borough* at 537 (3rd Cir. 1996), *quoting and citing Restatement of the Law Governing Lawyers § 130(1) (Final Draft No. 1, 1996)* and *Rhone-Poulenc Rorer Inc. v. Home Indem Co*, 32 F3d 851, 863 (3rd Cir. 1994). Contrary to Defense Counsel there are no bright line rules here, as in explicit waiver. Nothing within the rule requires the client to use the magic words "advice of counsel" or to explicitly reveal what the attorney-client communication was, as the *Livingstone* and *Bilzerian* decisions make clear. Rather, the question is a fact intensive one: has the client affirmatively raised an issue that requires permitting the opposing party to investigate the attorney's advice? Here several affirmative defenses are built around an attorney client communication, the Saiber Report dated February 9, 2018, but Defendants are attempting to use selective disclosure of the facts and

communications which underly that report, and otherwise to obscure counsels' heavy role in the facts surrounding that report.

Defense Counsel simply misses this issue and attempts to confuse the argument by conflating the tests for explicit and implicit waiver.  The only authorities Defense Counsel proffers for its confused position are *Rhone-Poulenc Rorer Inc, supra.; N. River Ins. Co. v. Phila. Reinsurance Corp*., 797 F. Supp. 363 (D.N.J., 1992); and *Berardino v. Prestige Mgmt. Servs.*, 2017 U.S. Dist. LEXIS 40951.  But these authorities are either misread by Defense Counsel, or distinguishable.

In *Rhone-Poulenc* there were no affirmative defenses whatsoever that were offered by the party claiming attorney-client privilege.  *see Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 486 (3rd Cir. 1995) (confining *Rhone-Poulenc* to "the unique facts of that case" and noting the lack of affirmative defenses).  Thus, the privilege holder in *Rhone-Poulenc* had not crossed the first threshold of the test: he – or rather it— had not "affirmatively raised an issue."  But such is not the case here, where Defendants have raised several affirmative defenses which implicate attorney advice that is relevant to the legal significance of their conduct, and even released a report that contains selective disclosure of attorney-client communications.

As for *N. River Ins. Co. v. Phila. Reinsurance Corp*., *supra.*, it too is distinguishable:

> North River represented to the Court at oral argument that it has no intention to prove its case in any way by reliance *on any attorney-client communication, whether produced or withheld from discovery. It thus cannot be said that North River is using the attorney-client privilege as a "sword and shield" through selective disclosure of privileged documents. CIGNA Re has not identified any other manner through which North River has placed the advise of its counsel or other contents of any privileged communication in issue in this action*. Its argument that North River's merely placing the broad question of coverage in issue somehow makes it fair game for CIGNA Re to

discover confidential attorney-client communications is a misconstruction of the "in issue" doctrine.

*Id.* at 370-371 (emphasis supplied).

The *North River* court built its analysis only on whether an attorney client-communication had been or would be disclosed.  Here by contrast, Defendants' several affirmative defenses are built around an attorney client communication that has been disclosed, the Saiber Report dated February 9, 2018.  And Defendants are certainly attempting to use selective disclosure of the facts and communications which underly that report.  That is why Defendant's Privilege Log indicates numerous communications with the Saiber Law firm which are being held back on privilege grounds e.g., *Exhibit 1, Privilege Log at Nos. 258—262, 267—276, 278-284, (to name only a few).*

Nor is the Privilege Log the only evidence of the Saiber Firm's role.   In addition, Defendant Deek testified that there were other communications that occurred with the Saiber Firm that did not make it into the report but upon which he relied to establish his good faith:

Q:   <u>In asserting NJIT's good faith, you were acting and relying upon the Saiber report of February 9, 2018. Correct</u>?

A:   <u>....In part. Yes</u>.

Q:   <u>And you also in part relied upon other advice by the Saiber firm. Correct</u>?

A:   <u>...Yes</u>....

Q:   And there was other advice and communications by the Saiber firm, other than what is captured in their report of February 9, 2018.  Correct?

A:   Yes...

Q:   <u>And you're relying upon those other interactions to establish your good faith here. Aren't you</u>?

A:   ...Yes. I -- I would say the interaction -- they simply visited with me, asked me questions, and I answered them.

*Exhibit 2, Deek  Deposition pp. 154-156.*

This is the classic "sword and shield" scenario which is an abuse of the privileges.  The Defendants here resemble those in *Massachusetts Sch. of Law at Andover v. American Bar Ass'n.*, 895 F. Supp. 88 (ED PA, 1995).    In that case, a law school sued the American Bar Association over its failure to accredit the school.  The law school attached a report compiled by an attorney to its complaint, which allegedly demonstrated the law school's merits for accreditation.  The ABA moved to compel the production of all communications underlying the report and to depose the attorney.  The law school resisted on attorney-client privilege (among other grounds).  The court rejected this defense, noting that the "underlying communications between the two were the bricks and mortar from which the report was constructed and when the report was put into issue, so too were the communications." *Id.* at 91-92.  The court went on:

> In other words, when the report was attached to and relied on to prove the complaint, had there been any attorney-client privilege attached to the underlying communications, plaintiff would have put those communications into issue and thereby waived the privilege. Plaintiff cannot claim that some of the communications surrounding the report are privileged (those communications that did not make it into the final report) and some are not (those communications that did make it into the final report). As it is often said, the attorney-client privilege cannot be used as both a shield and a sword. *Id.*

The Third Circuit later followed the same logic in *Glenmede Trust Co. v. Thompson* when a party raised an attorney opinion letter as part of its defense:

> Here, Glenmede raised reliance on the advice of counsel regarding what parties should be included in the buy-back transaction as an affirmative

> defense to the Thompson family's claims and voluntarily produced the
> Opinion Letter and a draft of it in response to discovery requests.
> *Glenmede Trust Co. v. Thompson, supra*. at 486

As for *Berardino v. Prestige Mgmt. Servs.*, 2017 U.S. Dist. LEXIS 40951, it too is readily

distinguishable.  In *Berardino* there is no indication that there was any report from the

"professional consulting and accounting firm" (Axiom Advisors) that was released by the

privilege holder.  *Id*. at *5, 8-17.  Indeed, the sole document at issue appeared to be a draft report

dated several months *after* litigation had commenced.  As Judge Salas noted

> …Berardino's argument nevertheless fails because Document 4 (dated
> October 22, 2014) was created eight months after Prestige terminated
> Berardino and nearly five months after this litigation commenced and
> therefore could not have impacted Prestige's decision to either terminate
> Berardino or initiate this lawsuit.  *Id.* at *18.

Here, by contrast, Defendants have not only affirmatively pled and released the Saiber Report

dated February 9, 2018, they have held back hundreds of documents which predate both Jorjani's

termination and the litigation.  Included among the documents being repressed are numerous

items which deal with Jorjani's alleged OAQ violations, the very issue that dominates the Saiber

Report dated February 9, 2018.

Although no part of its central argument, Defense Counsel also cites to *Waugh v.*

*Pathmark Stores, Inc.*, 191 F.R.D. 427, 433 (D.N.J. 2000), for the proposition that "an attorney's

involvement in legal issues relevant to an employment law situation of an employee is not

grounds for waiver" and vaguely warns of the danger of "blanket waivers" that would occur by

mere consultation under Jorjani's alleged reading.  *Defense Letter Brief dated August 29, 2022,*

*p. 13*.  But actually the question is how close the attorney was to the firing, because *participation*

*and control* by an attorney are different from "mere consultation."  As the US District Court of

Massachusetts found while distinguishing *Waugh*, in *Waugh* "at most, the attorney e-mailed the

investigator asking for an update on 'the status of this matter' and attended a meeting at which the investigator reported her findings." *Koss v. Palmer Water Dep't*, 977 F.Supp.2d 28, 30 (D.Mass, 2013), *citing to Waugh* at 429 and 430.  The *Koss* court concluded that in *Waugh* the attorney's role had been limited to two brief contacts that were "reflective of his role as a legal advisor only."  *Id.*  By contrast, in *Koss* the court ordered defendants to produce their attorney's documents relating to the plaintiff's harassment claim because the defendants themselves had a) affirmatively pled the investigation; and b) their attorneys "although not personally conducting interviews, not only directed and collaborated" on the internal investigation, "but exercised significant control and influence" over it.  *Id.*   When attorneys are "part and parcel of the investigation which goes to the heart of Defendants' affirmative defense" any privilege is waived, both as to attorney-client and work product.  *Id.*

Those same characterizations are true not only of Defendant Stern (General Counsel at NJIT) and the Saiber Law Firm, but also of Defense Counsel herein.  Indeed, Defense Counsel not only make their appearance much earlier in the Privilege Log than the Saiber Firm (*Exhibit 1 above, Privilege Log, where Defense Counsel first makes their appearance on September 20, 2017 at entry no. 118, vs. October 17, 2017, which marks the Saiber Firm's first entry at entry no. 258*), they also show up *much* more frequently.

Significantly, Defense Counsel's extensive involvement not only pre-dates the Saiber Firm's investigation, it also pre-dates the decision to suspend Jorjani on September 25, 2017 solely on account of his speech; it pre-dates the Saiber Firm's report of February 9, 2018; it pre-dates Jorjani's notice of termination on February 13, 2018; and it certainly pre-dates the litigation herein, which only commenced on July 17, 2018, some ten months *after* Defense Counsel became involved in the Jorjani affair at NJIT.

Moreover, Defendant Deek testified at deposition that the counsel he sought with regard to how to handle Jorjani extended beyond University Counsel to *both* the Saiber Law firm *and to current counsel, Walsh, Pizzi, O'Riley, and Falanga, LLP*:

> Q: By the way -- you'll correct me if I'm wrong, Dr. Deek -- <u>but Saiber was not the only outside law firm that NJIT consulted with to determine the appropriate course of action with regard to Jorjani. Was it?</u>
>
> A: I don't know...
>
> Q: Okay. If I showed you your privilege log listing other attorneys, would that refresh your recollection?
>
> A: It might remind me what firm, yes, they are from. Because I obviously do recall meeting with attorneys, but I don't know if they were all from one firm....
>
> Q: <u>Okay. If we scroll down, page 8. Looking at entries for 124 on, they indicate that Holly Stern consulted with Trish O'Reilly of the Walsh Law Firm and Trevor Lyons of the Walsh Law Firm on or about September 21, 2017. Correct</u>?
>
> A:  <u>Trish et al. is correct. I remember that</u>.
>
> Q: <u>And that's Mr. Haefner's law firm. The one that's defending you today. Correct</u>?
>
> A: <u>Yes</u>.
>
> *Exhibit 2, Deek Deposition, pp. 158-159.*

Returning to Defendant Stern's part: she undoubtedly played a decisive role in the events that lead up to this litigation, with her hand in everything from the suspicious discussion of the Tracy v. Florida case[2] on January 24, 2017 (a time when no else seems to have ever been fired for failure to comply with OAQ requirements – *see Exhibit 3, Interrogatory Responses dated October 15, 2019 at pp. 9-10*) to the drafting of a letter ostensibly from Defendant (Provost) Deek that suspended Jorjani for protected speech on September 25, 2017 (*Exhibit43, the Deek Letter of September 25th ; cf. Exhibit 2 above, Deek Deposition at pp. 43-44*), to her active participation in the committee that ultimately decided to terminate Jorjani's position at NJIT. *Exhibit 2 above, Deek Deposition p. 251-253.*

In this regard, we note that Defendant Stern's participation in Jorjani's suspension appears to have been deliberately hidden from disclosure.  On the surface, the Deek Letter of September 25th would indicate the handiwork, naturally enough, of the Provost, not NJIT's General Counsel.  *Exhibit 4 above, .*  Yet at deposition, it transpired that Defendant Stern had handed the letter to Defendant Deek more or less as a *fait accompli.  Exhibit 2, Deek Deposition pp. 43-44.*  Notably, neither Defendant (Provost) Deek, nor Defendant (President) Bloom were eager to claim responsibility for the letter, or the decision to suspend Jorjani solely for protected speech.  Here is part of the exchange with Defendant Deek:

> Q: Dr. Deek, you authored this letter [the Deek Letter of September 25th].
> Correct?
>
> A: I did not.
>
> Q: You did not author this letter?

---

[2] **Error! Main Document Only.***Tracy v Florida Atlantic, SD FLA, Case No. 9:16-CV-80655*, concerned a university that was able to rid itself of an unwanted employee who had embarrassed the university through his extra-mural speech by pointing to alleged violations on an "outside activities form."  See *Decision dated December 15, 2016 in Tracy v Florida Atlantic (SD FLA, Case No. 9:16-CV-80655, DKT. 92 therein.*

A: I signed the letter. Right.

Q: You signed it?

A: Right.

Q: Who did you rely upon to author –who authored this letter, to your knowledge?

A:  In this case, this is the date's out of view, this was provided to my assistant to September 25th-- by University counsel.

---

A: I already said it wasn't me. It wasn't, and I will repeat. 'Cause that fact I know. It was not me.  *Exhibit 2 above,  Deek Deposition, pp. 43—44.*

Here is President Bloom's panicked testimony on the facts surrounding Jorjani's  suspension:

Q: President Bloom, [at this time, that is October 20, 2021, at 12:48 p.m.] do you see this demand by Glenda Gilmore in Exhibit No. 4 [another outside agitator loudly demanding action against Jorjani based on his protected speech], as a threat to Jorjani's academic freedom?

A: From her perspective, yes.  From my perspective, even today, it's an issue of which I am on real quicksand because I just did not, nor do I as we sit here today, have the full -- I never looked at, I told you earlier, the investigative report.  I was not in the meetings.  I was told when we made -- who's making the decision and why.  And I was counseled on that.  So –

*Exhibit 5, Bloom Deposition, p. 112*

After sparring a bit and attempting to evade straightforward questions (*i.e.* Q: Who made the decision to put [Jorjani] on paid leave?  A: I didn't.  Q: Who did?  A: I didn't.  Q:  That's not my question, sir… *Id.,  p. 113*), President Bloom ends by shifting blame to his second in command, Defendant Deek.  *Id.*  But as seen above, Defendant Deek in turn punts to Defendant Stern.

We note that the Interrogatory Responses provided early in disclosure (no doubt carefully prepared by Defense Counsel) gave no hint that Defendant Stern took an active part of the decision to suspend and then investigate Jorjani.  *Exhibits 3 above at p. 12-13 and Exhibit 6,*

*Supplemental Interrogatory Response dated November 16, 2019 at pp. 5-6.* Instead, those responses only identified President Joel Bloom, Dean Kevin Belfield, and Provost Fadi Deek as actors. It took depositions, with the defendant answering spontaneously without interference by counsel, to reveal counsel's role in the suspension. *Exhibit 2 above, Deek Deposition p.42-43; see also, Exhibit 5 above, Bloom Deposition, p. 112.* Notably, even the Supplementary Interrogatory response, which had been court ordered by Judge Falk at *DKT. 45*, failed to identify the fact the Defendant Stern was part of the decision to suspend and then investigate Jorjani. *Exhibit 6 above, Supplemental Interrogatory Response dated November 16, 2019 at pp. 5-6.* Whether this was extremely poor draftsmanship (twice), or a deliberate attempt to play over the ethical lines by withholding pertinent facts, we cannot at present say. But it certainly smells bad.

Indeed, Defendant's deceptive Interrogatory Responses appear to be part of a larger pattern of ethical lapses by Defense Counsel. The judge whom Defense Counsel extensively quotes to disparage Jorjani and counsel near the beginning of his letter brief (Defense Letter Brief dated August 29, 2022, pp. 1-5) is retired Judge Mark Falk. He is now a recent addition to Defense Counsel's firm. see https://walsh.law/attorney/judge-mark-falk/. Indeed, an article from *Law 360* quotes Defense Counsel as actively seeking out Judge Falk to work for it: "….it was not a difficult decision for us to seek him out to lead our mediation, arbitration and special master appointments practice." *Exhibit 7, Law 360 Article dated September 30, 2021.* That same article quotes Judge Falk as having a friend and former colleague at Defense Counsel during the pendency of this case, a fact which, standing alone, we concede is not necessarily an ethical violation. *Id.* But this fact does not stand alone.

Neither Jorjani, nor his counsel, have given "consent, confirmed in writing" to retired Judge Falk's participation in representing any defendants herein.  Indeed, no notice whatsoever was ever given to counsel for Jorjani, or to Jorjani himself, regarding retired Judge Falk's new position with Defense Counsel.  This violates Rule 1.12(a) of the Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court (applicable to attorneys before this Court through Local Civ. Rule 103.1).

Rule 1.12(a) disqualifies retired Judge Falk from any work on the instant case.  And with retired Judge Falk disqualified under Rule 1.12(a), so is the rest of Defense Counsel disqualified under Rule 1.12(b): "… no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation…"

Notably, there has been no "written notice," prompt or otherwise, "given to the parties and any appropriate tribunal to enable" anyone to ascertain compliance with Rule 1.12.[3]  Thus, it appears that Defense Counsel has been in continuing violation of Rule 1.12 since September.

Furthermore, given the apparent violation of Rule 1.12(a) and (b), coupled with Defense Counsel's statement of active solicitation of Judge Falk as related in the "Law 360" article referenced above and Judge Falk's friendship with another member of Defense Counsel, Jorjani has concerns that Rule 1.12(c) may have been violated during the pendency of this case.

From the very beginning, however, Defendants have deployed a thin patina of legalese, which we now know was generated by counsel, to shield the fact that what they were doing was

---

[3]  Oh, and the decision which Defense Counsel adverts to at DKT. 58?  It appears to have been clear error: an affidavit or other sworn evidence has long been required to support a privilege log in this circuit: e.g. "In short, a party resisting discovery on the ground of the attorney-client privilege must by affidavit show sufficient Facts as to bring the identified and described document within the narrow confines of the privilege."  *Barr Marine Products Co. v. Borg-Warner Corp.*, 84 F.R.D. 631,636 (ED Pa., 1991), *quoting International Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88, 94 (D.Del.1974); *see also, Reich v. Hercules, Inc.*, 857 F. Supp. 367, 372, (DNJ, 1994) "Noticeably absent from Hercules' submissions are any affidavits from Hercules plant managers attesting to these instructions from counsel…"  Notably, retired Judge Falk disposed of Jorjani's argument in a footnote (fn8) that cited no substantive law whatsoever.

punishing an unpopular speaker for the content and viewpoint of his speech.  Nothing illustrates this so well as the notice of suspension Jorjani received *via* the Deek Letter of September 25th, and the revelations that came out at deposition.  The Court will note that the Deek Letter of September 25th uses the coded word "disruption" to justify the adverse action taken against Jorjani.  *Exhibit 4 above, Deek Letter of September 25th.*

But upon questioning at deposition, it transpired that this alleged "disruption" turned out to be nothing more than other people's negative reactions to Jorjani –  "emails amongst faculty and staff and emails and telephone calls from outsiders" who were unhappy with Jorjani's constitutionally protected speech.  *Exhibit 2 above, Deek Deposition, pp. 14-15, 19-23 ;see also Exhibit 5 above, Bloom Deposition pp. 153-154.*  Furthermore, Defendant (Provost) Deek conceded that the only "disruptions" NJIT could point to at the time of Jorjani's suspension stemmed entirely from the NYT-Op-Ed, meaning that the content of Jorjani's speech was the *sole* reason for the immediate adverse action against him worked by the suspension on September 25, 2017.  *Exhibit 2 above, Deek Deposition, pp. 47-48.*  Ultimately, Jorjani would be fired (technically non-renewed[4]), with NJIT again citing his protected speech as a substantial factor.  *Exhibit 3 above, Interrogatory Response dated October 15, 2019 at pp. 15-16.*

It is, of course, axiomatic that one cannot regulate or burden speech because the people who hear it are offended.  This is a violation at the very heart of the First Amendment, *e.g.* "Listeners' reaction to speech is not a content-neutral basis for regulation."  *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (citations omitted); "Whatever 'secondary effects' means, I agree that it cannot include listeners' reactions to speech."  *Boos v. Barry*, 485 U.S. 312, 334 (1988) (Brennan, J., concur).  "If there is a bedrock principle underlying the First

---

[4]  The law treats non-renewal for political beliefs as the equivalent of being fired for political beliefs. *Furlong v. Gudknecht*, 808 F.2d 233, 237-238 (3rd Cir. 1986) and *Elrod v. Burns*, 427 U.S. 347, 360, n. 13 (1976).

Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011), *quoting Texas v. Johnson*, 491 U.S. 397, 414 (1989).  There is no exception to these elementary principles when the speech offends those who hold conventional views on race, as do most of the NJIT faculty.

Furthermore, NJIT is not only a state entity, but a university; it therefore has a duty to protect unorthodox or unpopular speakers, *e.g.* "[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988), *quoting  FCC v. Pacifica Foundation*, 438 U. S. 726, 745-746 (1978).  This duty to protect unpopular speech takes on added weight in the context of a public university, which must safeguard academic freedom.  As the Third Circuit once noted, academic freedom is the "lifeblood" of a university, which is obligated to maintain an atmosphere where men can "examine all options, no matter how unpopular or unorthodox" in a setting "without concern that their careers will be indelibly marred by daring to think along nonconformist pathways."  *Kunda v. Muhlenberg College*, 621 F.2d 532, 547 (3rd Cir.1980).

That a state institution (let alone a state university, obligated to permit the examination of "all options, no matter how unpopular or unorthodox") cannot punish an employee for protected speech is obvious; indeed, it is hornbook law.

Nevertheless, in the face of what certainly appears to be a damning set of facts, NJIT has affirmatively pled their "good faith," "lack of willfulness," "neutral policy regarding disclosure of outside activities and conflicts of interests [which] plaintiff unreasonably failed to follow," and related defenses which involve the advice of counsel, including but not limited to the Saiber

Report.  *Exhibit 2, Deek Deposition, p. 147, 153-157*.  Much like a party affirmatively raising a

*Faragher-Ellerth* defense, a party cannot affirmatively plead their internal investigation to show

their probity without waiving privilege.  *United States ex rel. Ortiz v. Mount Sinai Hosp*., 185

FSupp.3d 383, 390-3911 (SDNY, 2016), citing *Koumoulis v. Independent Marketing Group,*

*Inc.*, 295 F.R.D. 28, 41 (E.D.N.Y. 2013) (quoting *Angelone v. Xerox Corp*., 2011 U.S. Dist.

LEXIS 109407, 2011 WL 4473534, at * 2 (W.D.N.Y. Sept. 26, 2011) - *noting the waiver applies*

*to both attorney-client and work product privilege*).

   The waiver here must encompass all attorneys advising the NJIT Defendants, at the very

least, during the pre-termination and pre-litigation stage of the matter, when Jorjani was

suspended solely because of protected speech and then terminated in substantial part because of

protected speech:

> In short, Mr. Ragbir cannot confine the waiver simply by naming some
> attorneys but not others in his petition. Barring the government from
> exploring these issues would impair the fairness of the proceeding by
> depriving the court of evidence necessary to a decision on these claims—
> essentially allowing Mr. Ragbir to use the privilege impermissibly, as both
> sword and shield." *Ragbir v. United States*, 2018 U.S. Dist. LEXIS 66197,
> *9-11 (D.N.J.).
>
> See also,  *Glenmede Trust Co. v. Thompson* at 486-487 (3rd Cir. 1995)

It thus extends not simply to Defendant Stern and the Saiber Law Firm, but also to Defense

Counsel, who inserted themselves into this affair no later than September 20, 2017, before

Jorjani was even suspended on September 25, 2017.  *Exhibit 1 above, Privilege Log at No. 118.*

It also applies equally to attorney-client and work product privilege.  *Ragbir v. United States*,

2018 U.S. Dist. LEXIS 66197, *8, N5.

Turning now to the (somewhat tedious) task of addressing each of Defense Counsel's defenses of his specific deposition objections, it is Jorjani's position the foregoing should be sufficient to rebut them.  To the extent that it is not, we offer the following itemization:

- Provost Deek at Page 44:9-13: Defendant's argument here rests on his confusion of the explicit waiver test with the implicit waiver test.  Being error, his objections cannot stand.  It is also error because the attorney-client privilege protects communication, not facts; and whether Defendant Deek relied on the advice of an attorney is a question of fact.  We submit that it should be beyond dispute that the fact of attorney-client consultation is discoverable.   (e.g. "these interrogatories only seek the fact of legal consultation, which is not protected by the attorney-client privilege. *See Howell v. Jones*, 516 F.2d 53, 58 (5th Cir. 1975) (noting that great weight of authority treats fact of consultation outside scope of attorney-client privilege); *see also H.W. Carter & Sons v. William Carter Co.*, 1995 U.S. Dist. LEXIS 6578, 1995 WL 301351, at *3 (S.D.N.Y. May 16, 1995) (noting that "attorney-client privilege does not extend to facts pertaining to the existence of an attorney-client relationship, the fact of consultation, or the dates and general nature of legal services performed").  Nor is the fact of consultation protected by the work-product privilege. *McCrink v. Peoples Benefit Life Ins. Co.*, 2004 U.S. Dist. LEXIS 23990, *16).

- Provost Deek at Page 148: 4-18:  The same as above.  Indeed, Defense Counsel specifically repeats his erroneous description of the test for waiver at page 17 of his letter brief.  Furthermore, if it is "well known" that attorney-client and work product privilege does not attach to documents produced in the course of

an internal investigation, then Defense Counsel should explain why he is attempting to hold back numerous exchanges with the Saiber Firm, as detailed in the Privilege Log above.  Moreover, the waiver that comes about through the Saiber Report certainly extends to both Defendant Stern and Defense Counsel itself, as per *Glenmede Trust Co. v. Thompson*, supra. at 486-487  and *Ragbir v. United States*, supra. at *9-11.

- Provost Deek at Page 150:7-18: Defense Counsel's argument here rests on his confusion of the explicit waiver test with the implicit waiver test.  Being error, his objections cannot stand.  It is also error because the attorney-client privilege protects communication, not facts; and whether Defendant Deek relied on the advice of an attorney is a question of fact.

- Provost Deek at Page 151:6-23: The same as above.

- Provost Deek at Page 158:1-7: The same as above.

- Provost Deek at Page 159:12-25: Contra Defense Counsel, there is certainly a basis for extending the waiver to Defense Counsel itself under the holdings of *Glenmede Trust Co. v. Thompson*, supra. at 486-487  and *Ragbir v. United States*, supra. at *9-11.  Indeed, Defense Counsel appear to be attempting to define the scope of the defense that they have raised.  Both Third Circuit precedent at *Glenmede Trust Co. v. Thompson*, supra. and the authority cited by that precedent (*In re ML-Lee Acquisition Fund II, L.P*., 859 F. Supp. 765, 767 (Del Dis, 1994)) make clear that Jorjani should be able to test the good faith of Defendants by inquiring into "for example, whether the [Defendants] disclosed all material facts to counsel, whether counsel gave an otherwise well-informed

18

opinion, did the [Defendants] follow the advice from counsel" (*In re ML-Lee Acquisition Fund II, L.P., supra.*) before they did something as preposterous as penalizing Jorjani with suspension solely because of protected speech on September 25, 2017.

- Provost Deek at Page 161:10-25:  In addition to the above, again, it is axiomatic that attorney-client privilege protects communications, not facts (*Upjohn Co. v. United States*, 449 U.S. 383, 396(1981)); and whether Defense Counsel helped formulate NJIT's policy with regard to Jorjani is a question of fact.

- Professor Katz at 109:19-110:18:  Defense Counsel's objections here are without substance.  The question of whether Professor Katz was in fact discussing Jorjani's OAQ compliance with counsel in April of 2017 is again one of fact.  It is also general enough not to directly invade the privilege, assuming any such privilege is left.  And no one has yet "ruled" on the veracity of Defendant's Privilege Log.  The Court has only held, improperly it seems, that the form of the Privilege Log conformed to the law.  Jorjani is certainly entitled to "test the veracity and sincerity" of Defendant's action.  *In re ML-Lee Acquisition Fund II, L.P., supra*.  At a minimum, that should begin with confirming that the events identified in the Privilege Log took place.  Nor do we have to take counsel's word for it.  As the discrepancies between Defendant's Interrogatory Responses and the deposition testimony shows, Defense Counsel betrays a marked inability to portray the facts correctly.  None of the rest of Defendant's argument bears the initial objection Jorjani had

raised, which is that the privilege itself is dependent on the subjective intent of the party to seek legal advice (whether expressed or not).  Here Professor Katz plainly lacked that intent.

- Dean Belfield at 66:25, 67:22, 68:6, 68:19, 70:4:  These are all variations on Defense Counsel's objections as to whether his client sought attorney advice. Again, that is a fact question which is not privileged.

- Dean Belfield at 72:1-11:  Jorjani is certainly able to inquire whether Dean Belfield understood General Counsel Stern was concerned with Jorjani. Defense Counsel states that he worries that the answer would reveal whether facts had been communicated to General Counsel Stern about Jorjani, something his own Privilege Log repeatedly demonstrates.  The objection is therefore frivolous.  Nor would Dean Belfield be "speculating" given the close working relationship evident between those in the upper administration of NJIT.

- Dean Belfield at 88:8, 92:19, 95:22, and 99:18: The is a repeat of Defense Counsel's objection with regard to Professor Katz.  The argument there suffices: whether the consultations indicated in the Privilege Log took place is a question of fact, which Jorjani must be able to test.  The objections are without substance.

- Dean Belfield at 102:1-13: We apologize for being repetitious, but whether Dean Belfield sought legal advice, and received legal advice, and relied upon legal advice are permissible questions of fact.

- Dean Belfield at 122: 1-15: The question was "Can you think of a reason you would need legal advice on how to respond to a media inquiry?" But whatever concerns about the facts that led Dean Belfield to seek legal advice are themselves factual inquiries, which are plainly permissible. They also bear on the alleged good faith Dean Belfield has affirmatively pled.

- Dean Belfield at 134:3, 134:16, 1335:11, 135:25, and 136:16: The is another repeat of Defense Counsel's objection with regard to Professor Katz. The argument there suffices: whether the consultations indicated in the Privilege Log took place is a question of fact, which Jorjani must be able to test. The objections are without substance.

- Dean Belfield at 1733:23: The question about whether Dean Belfield ever asked General Counsel about whether an employee could be fired for so-called "hate speech" is permissible even under the vague standard urged by Defense Counsel (a general description appearing in a course catalogue). In any event, Dean Belfield indicated earlier on the page that he thought there might be certain conditions under which he could terminate a university employee for so-called "hate speech" and that "university counsel" would likely be a source for him. Following up with a question as to whether he ever did ask Defendant Stern (who was university counsel at the time) about this subject in general is simply not objectionable. The question itself had no ties to any specific person or circumstance. Furthermore, given that hate speech has been repeatedly held to be a protected category for over four decades since *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and Dean Belfield has affirmatively raised the issue of his

own good faith, Jorjani would be entitled to ask not only the general question posed, but even to probe as to whether Dean Belfield consulted general Counsel Stern as to Jorjani specifically.   This is once again controlled by *Glenmede Trust Co. v. Thompson*, supra. and *In re ML-Lee Acquisition Fund II, L.P.*, 859 F. Supp. 765, 767 (Del Dis, 1994)) because it goes to probing "whether the [Defendants] disclosed all material facts to counsel, whether counsel gave an otherwise well-informed opinion, did the [Defendants] follow the advice from counsel." *In re ML-Lee Acquisition Fund II, L.P., supra*.

For the forgoing reason, Jorjani respectfully submits that the Court should rule that Defendants have implicitly waived attorney-client and work product privilege as to the documents held back in the Privilege Log, permit the deposition of attorneys from the Saiber Firm and Defense Counsel herein, and order Defendants and Professor Katz to re-appear for depositions to answer the questions objected to (and follow up questions), with costs awarded to Jorjani.

Dated: Goshen, New York     Yours, etc.
       September 12, 2022

                /s/Frederick C. Kelly
                Frederick C. Kelly, Esq.
                *Attorney for Plaintiff*
                One Harriman Square
                Goshen, NY 10924
                (845) 294-7945
                *Pro Hac Vice*