UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JASON JORJANI,<br><br>            Plaintiff,<br>v.<br><br>NEW JERSEY INSTITUTE OF<br>TECHNOLOGY et al.,<br><br>            Defendants. | Civ. No. 2:18-cv-11693 (WJM)<br>Civ. No. 2:20-cv-1422 (WJM)<br><br>OPINION |

## WILLIAM J. MARTINI, U.S.D.J.

This matter comes before the Court upon the cross motions for summary judgment filed by Plaintiff Jason Jorjani ("Plaintiff"), ECF No. 118, and Defendants New Jersey Institute of Technology, Joel Bloom, Kevin J. Belfield, Fadi P. Deek, Holly Stern, and Christine Li ("Defendants"), ECF No. 180. Having reviewed the parties' submissions closely, the Court decides the motions without oral argument. See Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, Defendants' motion is **GRANTED** and Plaintiff's motion is **DENIED**.

### I.  BACKGROUND

This action for First Amendment Retaliation arises out of the non-renewal of Plaintiff's contract as a lecturer at New Jersey Institute of Technology ("NJIT"), a public university in Newark, New Jersey. Plaintiff began teaching as a full-time philosophy lecturer in the Department of Humanities at NJIT in the Fall of 2015. Pl.'s SMF ¶ 1.[1] Lecturers are teaching faculty that rank above adjuncts, but below tenure track faculty and tenured professors. *Id.* ¶ 2. Plaintiff's contract was renewed in the Spring of 2016 and again in the Spring of 2017. *Id.* ¶ 4.

---

[1] The Court will refer to the parties' Statements of Material Facts pursuant to L. Civ. R. 56.1, and responses thereto, as follows: Plaintiff's Statement of Material Facts ("Pl.'s SMF"), ECF No. 121; Defendants' Statement of Material Facts ("Defs.' SMF"), ECF No. 181-1; Defendants' Response to Plaintiff's Statement of Material Facts ("Defs.' Resp. Pl.'s SMF"), ECF No. 184-1; Plaintiff's Response to Defendants' Statement of Material Facts ("Pl.'s Resp. Defs.' SMF"), ECF No. 185-1. The Court will refer to exhibits to the Certification of Frederick C. Kelley, ECF No. 119, as Plaintiff's Exhibit ("Pl.'s Ex.") and exhibits to the Certification of Marc D. Haefner, ECF No. 181-2, as Defendants' Exhibit ("Defs.' Ex.").

A.  New York Times Op-Ed and Response

In the Fall of 2016, Plaintiff formed alliances within the political movement known as the Alt Right to promote his philosophy of an "affirmation of the Indo-European Tradition," which Plaintiff describes as the idea that "European cultures are intimately related to those of Greater Iran and the Persianate World, Hindu India, and the Buddhist East and are the sources of the world's greatest scientific, artistic, and spiritual developments." Am. Compl. ¶ 24, ECF No. 30; Pl.'s Resp. to Defs.' SMF ¶ 2. To broaden this message, Plaintiff formed the "Alt Right Corporation." Pl.'s Resp. to Defs.' SMF ¶ 3. In the Summer of 2017, a graduate student purportedly named Erik Hellberg, who was interested in "how the Left persecutes and silences Right wing thought in academia," set up a meeting with Plaintiff to discuss the topic. *Id.* ¶ 4. In actuality, Hellberg was an agent of the ideological watchdog group "Hope Not Hate," which has the goal of "deconstructing" individuals it labels as fascists or extremists. *Id.* ¶ 5. Hellberg, whose real name was Patrik Hermansson, videotaped their conversation without Plaintiff's knowledge,[2] which touched on matters of race, immigration, and politics. *Id.* ¶ 6. On September 19, 2017, *The New York Times* ("NYT") published an op-ed ("Op-Ed") containing an edited version of the recorded conversation ("Recording"). *Id.* ¶ 7. In the Recording, a clip of Plaintiff speaking at a conference shows Plaintiff characterizing "universal human rights" as an "ill-conceived and bankrupt" socio-political ideology. Jesse Singal, Opinion, *Undercover With the Alt-Right*, N.Y. Times (Sept. 19, 2017), https://www.nytimes.com/2017/09/19/opinion/alt-right-white-supremacy-undercover.html (last accessed July 29, 2024). The Recording then cuts to the video recording of Plaintiff's conversation with Hellberg, where Plaintiff is seen calling for the creation of a "revolutionary state" as the present order begins to disintegrate. *Id.* He states that "it's going to end" with the expulsion of migrants and citizens who are primarily of Muslim descent, concentration camps, and war "at the cost of a few hundred million people." *Id.* Plaintiff then continues, "We will have a Europe, in 2050 where the banknotes have Adolf Hitler, Napolean Bonaparte, Alexander the Great. And Hitler will be seen like that: like Napolean, like Alexander; not like some weird monster, who is unique in his own category. No, he's just going to be seen as a great European leader." Pl.'s Resp. to Defs.' SMF ¶ 8.

The next day, after reviewing the Op-Ed and Recording, Defendants Joel S. Bloom ("Bloom"), NJIT's President, and Kevin J. Belfield ("Belfield"), Dean of NJIT's College

---

[2] The Court notes that the unedited video footage demonstrates that just a few minutes into the conversation, Hellberg holds up an audio recorder and asks Plaintiff if he can record their conversation, to which Plaintiff responds affirmatively. Ex. 1 to Pl.'s Opp. Br. at 04:56, ECF No. 185. Plaintiff subsequently makes several references to the conversation being "on the record," *id.* at 17:37; 18:12; 33:30, until they reach the point of the conversation at issue in the instant case, where Plaintiff says to Hellberg, "Now that you're not recording . . . ." before continuing. *Id.* at 01:37:54.

of Science and Liberal Arts, sent a faculty- and staff-wide email ("September 20, 2017 Email") stating:

> NJIT is a university that embraces diversity and sees it as a source of strength. The statements made by Mr. Jorjani in a video recently published by the [NYT] are repugnant and antithetical to our institution's core values. We presently are conducting a review of this matter and will provide additional information as soon as that review is complete.

*Id.* ¶ 9; Defs.' Ex. 4. In a September 21, 2017, email to Bloom and Belfield, Plaintiff told NJIT that he was a victim of clever editing and that he had been grossly misrepresented by the NYT Op-Ed and Recording. *Id.* ¶ 10; Defs.' Ex. 5. On September 25, 2017, NJIT placed Plaintiff on paid administrative leave and launched an investigation. *Id.* ¶ 11; Defs.' Ex. 6. NJIT's letter to Plaintiff stated, in part:

> We are aware of a recent New York Times article, as well as your responses to that article. The article as related to you has caused significant disruption at the university, and based on our information, we believe that the disruption will continue to expand. Further, the article and subsequent information provided by you reveals your association with organizations that were not disclosed on your outside activity forms, despite being directed by your Chair to fully update your outside activity disclosure form last Spring. Given the disruptive impact of these events upon the university community, we are placing you on paid administrative leave effective immediately. During that time, we will continue our investigation with regard to whether your actions have violated university and academic policies, as well as State ethics violations.

Defs.' Ex. 6. In the immediate aftermath of the NYT Op-Ed, Belfield testified that "multitudes of faculty, staff, and students" came to his door to complain. Belfield Dep. 192:7-13. Additionally, Defendants, along with other NJIT faculty and personnel, received approximately fifty communications from NJIT alumni, parents, and others both within and outside of the university expressing concern and outrage regarding Plaintiff's views. Pl.'s Resp. to Defs.' SMF ¶ 29; Defs.' Exs. 18-21; Deek Dep. 182:4-183:4. As part of these communications, a student's email was forwarded to Belfield and Eric Katz, Chair of NJIT's Humanities Department, concerning a class meeting of Plaintiff's "The History of Ideas" course, wherein the student recounted that Plaintiff "seemed to want to make the case" that the "original white people, or Aryans, came from Iran . . . . I googled him after class and didn't like what I found so I dropped his class." Pl.'s Resp. to Defs.' SMF ¶ 33.

  B. "Against Perennial Philosophy" and Faculty Response

The NYT Op-Ed and Recording led to many of Plaintiff's co-workers examining his scholarship and written works. *Id.* ¶ 12. One of the works they found was Plaintiff's

3

October 21, 2016 post published on AltRight.com entitled, "Against Perennial Philosophy," which identifies Plaintiff as a full-time faculty member at NJIT.[3] *Id.*; Defs.' Ex. 7. In the article, Plaintiff states that he was asked by the "think tank of the Iranian Renaissance organization to which [he] belong[ed] . . . whether, or to what extent, anything worthy of the name 'Philosophy' transpired in Iran during the so-called 'Islamic Golden Age.'" Defs.' Ex. 7 at 2. Stating that his presentation "has profound significance for the ideological structure of the New Right or AltRight movement[,]" *id.*, Plaintiff posits that "human racial equality" is a "left-wing myth" and that the mentality that produces great incisive philosophy has "a genetic basis" that is not found in "Asians, Arabs, Africans, and other-non-Aryan peoples[,]" *id.* at 9; Pl.'s' Resp. Defs.' SMF ¶ 16.

On this point, the article states, in relevant part, that:

> It turns out that there were multiple co-existing Hominid species, which were vastly unequal in significant respects such as their cognitive abilities. So-called Homo Sapiens did not neatly and cleanly follow these extinct species in evolutionary history. Rather, different groups of Hominids that are now extinct mated with certain populations of Homo Sapiens and not with others. For example, many Europeans have Neanderthal genes but no Africans do. Many Africans and South Indians have genes from an extinct Hominid called the Denosovan, but no Europeans have Denosovan genes. Racial difference is real, and it matters. That Africans have an average IQ of around 75 whereas whites have an average IQ of around 100, and Africans who have mixed with whites (for example in North America or South Africa) have an average IQ of around 85 has to do not with education or social conditioning, but with different genetic inheritances from extinct Hominid species.

Defs.' Ex. 7 at 9. Plaintiff also states that "[w]ith the emerging technologies of embryo selection and genetic engineering" and with "the right leadership and government planning," it would be possible to produce thinkers on the level of "Hegel, Nietzsche, or Heidegger," to "restore the pre-Arab and pre-Mongol genetic character of the majority of the Iranian population within only one or two generations." *Id.* at 10. Plaintiff concludes that he is "sorry to have to suggest that this might be necessary in order to Make Iran Great Again." *Id.*

On October 4, 2017, NJIT's student newspaper, *The Vector*, published a "Statement from the Department of Biological Sciences at NJIT" signed by eighteen individuals, opining that Plaintiff's "beliefs, as revealed by his remarks, cannot help but produce a discriminatory and intimidating educational environment for [NJIT's] diverse student body" and "makes him unfit to teach at NJIT, or indeed at any academic institution that considers its students to have equal value and potential." Defs.' Ex. 9. On October 12,

---

[3] Deek testified that he received notice of this article "about the same time" as the NYT Op-Ed. Deek Dep. 20:1-5.

4

2017, *The Vector* published an "Official Faculty Senate State [*sic*] Statement" declaring that "NJIT is a university that embraces diversity and sees that diversity as a source of strength. The NJIT Faculty Senate finds racist pronouncements made by University Lecturer Jason Reza Jorjani to be morally repugnant. Hate and bigotry have no place on the NJIT campus." Defs.' Ex. 10. On October 25, 2017, *The Vector* published a "Statement by the Faculty and Staff of the Federated History Department at NJIT and Rutgers University, Newark Regarding Dr. Jason Jorjani." Defs.' Ex. 11. The statement, which was signed by thirty individuals, "denounce[s] NJIT University Lecturer Jason Jorjani's views on race in his comments, writing, and interviews." *Id.* The statement asserts in part that "Dr. Jorjani's published beliefs create a hostile learning environment for students of color in particular, and his presence on the instructional staff at NJIT appears to legitimize discredited race-based ideas about intelligence and citizenship that have no place in academia. It is our collective belief that Dr. Jorjani's eventual termination as a University Lecturer would be justified and consistent with the principles of academic freedom and NJIT's mission." *Id.*

### C. NJIT's Investigation

On October 12, 2017, NJIT retained Saiber LLC ("Saiber") to investigate and determine whether Plaintiff: (1) violated any of his faculty obligations to NJIT, including any violations of university policies; (2) fulling and accurately disclosed his outside activities as required by New Jersey's conflicts of interest laws and applicable regulations; and (3) engaged in any outside activities that resulted in a conflict of interest with his responsibilities toward NJIT. Defs.' Ex. 23 at 1. However, inquiry into the content of any speech by Plaintiff was outside the scope of Saiber's charge. *Id.* at 1 n.1.

Saiber's report found, *inter alia*, that: (1) Plaintiff violated the New Jersey ethics code by failing to disclose that he was a founder, director, and shareholder of the AltRight Corporation; (2) that Plaintiff violated NJIT faculty policy by cancelling 13 classes in the Spring of 2017 without informing his department, that some of Plaintiff's absences were not due to illness as he suggested, and that his class cancellations led to several students including comments about the excessive cancellations in their student evaluations that semester; (3) that Plaintiff's claims that video excerpts in the NYT Op-Ed were misleadingly edited to paint Plaintiff in a false light regarding his statements about Hitler and the genocide of Muslims were inaccurate and inconsistent with the unedited video; (4) that Plaintiff exhibited a clear pattern of non-responsiveness from the time he started working at NJIT and he did not, as was expected, regularly check his NJIT email or his mailbox, causing a persistent problem. Defs.' Ex. 23 at 3-4, 35-40.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action against NJIT, Bloom, Belfield, and other NJIT employees on July 17, 2018. ECF No. 1. Plaintiff filed a second action against additional individuals affiliated with NJIT, including Provost and Senior Executive Vice President

5

Fadi P. Deek ("Deek"), General Counsel and Vice President Holly Stern ("Stern"), and Associate General Counsel and Ethics Liaison Officer Christine Li ("Li"), on February 11, 2020. Civ. No. 2:20-cv-01422, ECF No. 4. The cases were consolidated on December 9, 2020, with the instant case serving as the lead case. ECF No. 56. After significant motion practice, the following claims remain: (1) First Amendment Retaliation against NJIT and Bloom in violation of 42 U.S.C. § 1983; (2) Conspiracy to Violate Plaintiff's Civil Rights against Bloom and Belfield in violation of § 1983; and (3) Conspiracy to Violate Plaintiff's Civil Rights against Deek, Stern, and Li in violation of § 1983.[4]

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In deciding a motion for summary judgment, the Court construes all facts and inferences in the light most favorable to the non-moving party. *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the initial burden of showing the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact—that is, the "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). Once the moving party meets this burden, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a *genuine issue for trial* and do more than simply show that there is some metaphysical doubt as to the material facts." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-moving party must present actual evidence that creates a genuine issue for trial—reliance on unsupported assertions, speculation, or conclusory allegations is insufficient to defeat a motion for summary judgment. *Solomon v. Soc'y of Auto. Engineers*, 41 F. App'x 585, 586 (3d Cir. 2002) (citing *Celotex*, 477 U.S. at 324). Furthermore, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A fact is 'material' . . . if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson*, 477 U.S. at 248 (1986)). "A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

Where the parties have filed cross-motions for summary judgment, the summary judgment standard does not change. *In re Cooper*, 542 F. Supp. 2d 382, 385 (D.N.J. 2008) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). The court must

---

[4] Though not explicitly stated in the first cause of action in the Amended Complaint, the Court reads Plaintiff's First Amendment Retaliation claim against NJIT and Bloom as an alleged violation of § 1983.

6

consider each motion independently and view the evidence on each motion in the light most favorable to the party opposing the motion. *See Boardwalk Regency Corp. v. Unite Here Loc. 54*, No. CIV.08-0016, 2009 WL 540675, at *4 (D.N.J. Mar. 3, 2009) (first citing *Williams v. Philadelphia House Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994); and then citing *Matsushita*, 475 U.S. at 587).

## IV. DISCUSSION

Both parties have moved for summary judgment. Plaintiff moves for partial summary judgment against Defendants Bloom and Belfield for their conduct leading up to and including the September 20, 2017 Email and Plaintiff's placement on paid leave, whereas Defendants move for summary judgment to dismiss Plaintiff's case in its entirety.

### A. First Amendment Retaliation

"To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 986 (3d Cir. 2014). The first element—whether the employee's speech is protected by the First Amendment—is a question of law, while the second and third elements are questions of fact. *Id.* at 987. The Court need only consider the first element to find that Defendants are entitled to summary judgment on all of Plaintiff's claims.

#### 1. Protection Under the First Amendment

"[P]ublic employees do not surrender all of their First Amendment rights merely because of their employment status." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 465 (3d Cir. 2015) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). "As the Supreme Court has reiterated time and time again, 'free and unhindered debate on matters of public importance' is 'the core value of the Free Speech Clause of the First Amendment.'" *Dougherty*, 772 F.3d at 987 (quoting *Pickering v. Board of Education*, 391 U.S. 563, 573 (1968)). However, "[a]t the same time, the Supreme Court also aptly recognizes the government's countervailing interest—as an employer—in maintaining control over their employees' words and actions for the proper performance of the workplace." *Id.* "[P]ublic employers are still employers, and they therefore have the same concern for efficiency and the need to review and evaluate employees as any other employer in order to ensure that the actions of employees do not interfere with the performance of public functions." *Miller v. Clinton Cnty.*, 544 F.3d 542, 547 (3d Cir. 2008) (citing *Rankin v. McPherson*, 483 U.S. 378, 383-89 (1987)).

Thus, "[a] public employer . . . may impose speech restrictions that are necessary for efficient and effective operations." *Munroe*, 805 F.3d at 466. The Court's task "is to

seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick v. Myers*, 461 U.S. 138, 142 (1983) (alteration in original) (quoting *Pickering*, 391 U.S. at 568). As such, a three-step inquiry is conducted to determine whether a public employee's speech is protected by the First Amendment: "first, the employee must speak as a citizen, not as an employee[;] second, the speech must involve a matter of public concern[;] and third, the government must lack an 'adequate justification' for treating the employee differently than the general public based on its needs as an employer under the *Pickering* balancing test." *Dougherty*, 772 F.3d at 987.

For purposes of the instant motion, the parties have conceded the first two elements, namely, that Plaintiff was speaking as a citizen, and that the speech at issue involved a matter of public concern. Defs.' Mov. Br. 8 n.1; Pl.'s Opp. Br. 9. And "[f]or the most part, the relevant facts here are not in dispute; the parties [instead] differ primarily on their legal effect." *Czurlanis v. Albanese*, 721 F.2d 98, 102 (3d Cir. 1983). Accordingly, the parties' briefs assert divergent outcomes of the *Pickering* balance test.[5]

Under the *Pickering* balance test, courts are required to "balance the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Munroe*, 805 F.3d at 466 (cleaned up) (quoting *Dougherty*, 772 F.3d at 991 (quoting *Pickering*, 391 U.S. at 568)).

      a)    Parties' Respective Interests

Plaintiff asserts that his interest in speaking on matters of public concern is particularly strong because universities, unlike elementary or secondary schools, are a marketplace of ideas. Pl.'s Mov. Br. 14. Indeed, Plaintiff asserts that the public's strong reaction to his speech facilitated free and open debate, which he argues is essential to "the proper functioning of a university." Pl.'s Opp. Br. 11. Further, Plaintiff points out that his

---

[5] Citing to the U.S. Supreme Court's recognition in *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006) that the Court's "customary employee-speech jurisprudence" may not account for additional constitutional interests implicated by "expression related to academic scholarship or classroom instruction," Plaintiff suggests that *Pickering* should not apply in the context of higher education. Pl.'s Mov. Br. 23; Pl.'s Reply Br. 8-10. Because the parties agree for purposes of this motion that Plaintiff's speech was in his capacity as a citizen—and not related to "academic scholarship or classroom instruction" pursuant to his official duties as a Lecturer at NJIT—the Court will apply *Pickering* to the instant case. *See* Defs.' Opp. Br. 15; Pl.'s Reply Br. 9. Plaintiff also contends that *Pickering* is "useless" in the university context because no federal circuit court has upheld a lower court's finding against a university professor under *Pickering* balancing. Pl.'s Mov. Br. 23; Pl.'s Reply Br. 10. Plaintiff's assertion is immaterial: *Pickering* is widely applied in the public university context among circuit courts, including the Third Circuit. *See Gorum v. Sessoms*, 561 F.3d 179, 186 n.6 (3d Cir. 2009) (stating that *Pickering* applies where "*Garcetti*'s official duty test does not apply to a public instructor's speech 'related to scholarship or teaching'"); *see also Gruber v. Tennessee Tech Bd. of Trustees*, No. 22-6106, 2024 WL 3051196 (6th Cir. May 16, 2024) (affirming district court's finding against professor after balancing parties' interests under *Pickering*).

speech was extra-mural and made in confidence within a private conversation off campus. Pl.'s Opp. Br. 5.

Defendants, in contrast, argue that the NYT Op-Ed and Recording resulted in a "flurry of communications expressing outrage on the part of various constituencies both within and without NJIT (and indeed, nationally) and prompted statements disavowing Plaintiff's laudatory depiction of the Holocaust's architect." Defs.' Mov. Br. 12. Because of this, Defendants point out that "NJIT personnel were forced to divert their focus from NJIT's educational mission in favor of addressing voluminous complaints about Jorjani." *Id.* at 17 n.5. Additionally, Defendants argue that Plaintiff's post on AltRight.com, entitled "Against Perennial Philosophy," "impaired employee harmony" as evidenced by the "outpouring of communications" and "long string of letters that Plaintiff's coworkers published attacking his racist views[,]" which "recognized and expressed serious concerns about the harm to NJIT's learning environment posed by Plaintiff's ideology." *Id.* at 13-14.

Further, Defendants assert that Plaintiff's speech "created an unworkable situation" whereby Plaintiff "would be teaching students of ethnicities he deemed to be of inherently lesser intellectual value and injurious to the goal of restoring the preeminence of the Aryan heritage." *Id.* at 14-15. Defendants also maintain that the students' focus was diverted from the subject matter Plaintiff "was supposed to be teaching them" to Plaintiff's "racist beliefs and the disruption those beliefs had caused." *Id.* at 15. In support of this notion, Defendants point to Plaintiff's statements to a reporter that after the NYT Op-Ed was published, his students looked like they "had been gut-punched," as well as Bloom's testimony that the students were the first group to be upset by Plaintiff's beliefs. *Id.* Defendants note that these disruptions occurred against the backdrop of a university that has a "racially diverse student body" and currently lists "celebrat[ing] the inclusiveness of [the] university community" and being "sensitive to cultural and personal differences" as one of its core values. *Id.* (quoting NJIT, *Our Mission and Values*, https://www.njit.edu/about/our-mission-values (last accessed July 29, 2024)).[6]

Relatedly, Defendants argue that Plaintiff's paid leave and subsequent contract non-renewal was "justified and lawful" because "NJIT was seeking to protect the proper functioning of the university's educational purpose." *Id.* at 16. Comparing Plaintiff's speech to the speech at issue in *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454 (3d Cir. 2015)—where a high school teacher's derogatory remarks online about her students were found to have disrupted the plaintiff's teaching duties and the functioning of the school district—Defendants assert that Plaintiff's speech similarly caused disruption at NJIT because the student body that Plaintiff was tasked with teaching necessarily included

---

[6] Defendants note that 61% of NJIT's current student body is not white. Defs.' Mov. Br. at 17 n.4 (citing U.S. News & World Report, *New Jersey Institute of Technology*, https://www.usnews.com/best-colleges/njit-2621 (last accessed July 29, 2024)).

9

students of backgrounds that he deems "genetically inferior" and "subject to selective genetic engineering[.]" Defs.' Mov. Br. at 16-17.[7] Thus, Defendants conclude that NJIT has a "substantial interest in avoiding the educational and operational harms arising from the tension between (i) Jorjani's expression of the need to eliminate racially inferior genetic characteristics, on the one hand; and (ii) having Jorjani teach students having those genetic characteristics he posits ought to be eliminated, on the other." *Id.* at 17.

Because the "First Amendment does not require a Government employer to sit idly by while its employees insult those they are hired to serve[,]" Defendants argue, Plaintiff was "properly suspended with pay and his contract was properly not renewed[.]" *Id.* at 17-18 (emphasis and internal quotation marks omitted) (quoting *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006)).

### b) Balancing of *Pickering* Factors

"The balancing we must undertake is a fact-intensive inquiry that requires consideration of the entire record, and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest." *Miller*, 544 F.3d at 548. The statements at issue "will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin*, 483 U.S. at 388. "On the employee's side of the scale, we must consider the interests of both [the employee] and the public in the speech at issue." *Dougherty*, 772 F.3d at 991. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin*, 483 U.S. at 390. Conversely, regarding the government's interests, courts typically consider "whether the speech 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Dougherty*, 772 F.3d at 991 (quoting *Rankin*, 483 U.S. at 388).

Weighing the parties' respective interests here, the Court finds that Plaintiff's interest in his speech is outweighed by the Defendants' interest in maintaining the efficient provision of hostile-free educational services that it provides to the public.

---

[7] Defendants also cite to the opinion of their psychological expert, Alisha Ali, PhD. Defs.' Ex. 17. In her report, Dr. Ali opines that psychological research into what makes a good learning environment shows that "Jorjani would be unable to teach students philosophy and history, in part, because they would worry that their grades would be a product of Jorjani's stated racist disdain for the intelligence of certain groups of NJIT students." Defs.' Mov. Br. at 16. Dr. Ali also includes an interview with Bloom in her report during which he recounts conversations on two occasions with students regarding their concerns about Plaintiff. *Id.* at 15. However, unsworn expert reports are inadmissible on a summary judgment motion. *Snead v. Casino*, No. CV2116875, 2023 WL 7151187, at *6 (D.N.J. Oct. 31, 2023) (citing *Fowle v. C&C Cola*, 868 F.2d 59, 67 (3d Cir. 1989)). Thus, the Court will not consider Defendants' expert report at this juncture.

          (1)     Manner, Time, and Place of Speech

The U.S. Supreme Court has "recognized that certain private remarks" can "touch on matters of public concern and should thus be subject to *Pickering* balancing." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 84 (2004). For purposes of this motion, the parties have stipulated that Plaintiff's speech touched on matters of public concern. However, courts also consider "the manner, time, and place of the employee's expression" while balancing the parties' interests at the third step of the *Pickering* analysis. *Rankin*, 483 U.S. at 388. Here, the Court accords some weight to the fact that the conversation between Plaintiff and Hellberg depicted in the NYT Op-Ed and Recording was conducted under surreptitious conditions,[8] and that Plaintiff was not speaking on campus or using university resources to promote his messages. *Cf. Gruber v. Tennessee Tech Bd. of Trustees*, No. 22-6106, 2024 WL 3051196, at *4 (6th Cir. May 16, 2024) (relevant to *Pickering* analysis that professor posted flyers calling students and professor racist on college campus as opposed to off-campus). However, the Court notes that Plaintiff was aware that Hellberg had a tape recorder with him to assist with his purported student thesis, and that Plaintiff made several references "to the record" during their conversation before presuming that Hellberg was not recording when he said the statements about Hitler that were ultimately included in the NYT Op-Ed and Recording. Pl.'s Ex. 1 at 01:37:54. Additionally, the remainder of Plaintiff's speech at issue here was not conducted as privately. Plaintiff's speech condemning universal human rights at the start of the NYT Recording was part of the remarks he gave as a speaker at the 2016 National Policy Institute conference, Pl.'s Aff. ¶ 14, ECF No. 120, and his post on AltRight.com, "Against Perennial Philosophy," was publicly available online and excerpted from a "heavily redacted portion" of his presentation to an Iranian Renaissance organization. Defs.' Ex. 7.

          (2)     Interest of the Public in the Speech at Issue

Next, though the parties stipulate that Plaintiff's speech touched on matters of public concern, the Court must further weigh the relative interest of the public in the speech at issue. The Court finds that the public's interest in Plaintiff's speech is limited, as there is no assertion that Plaintiff's speech brought to light "any corruption, fraud, or other forms of illegal conduct on the part of Defendants," or any other government impropriety, which "occupies the highest rung of First Amendment protection." *Munroe*, 805 F.3d at 473 (citation and internal quotation marks omitted). Thus, "Defendants [are] not required to make an especially vigorous showing of actual or potential disruption in this case." *Id.* To the extent Plaintiff argues that his speech collides with government policy because the "civil rights regime" was "pioneered by the federal courts," Pl.'s Mov. Br. 22-23, the speech at issue does not resemble the objections to government impropriety that courts typically afford strong public interest.

---

[8] Such surreptitious conduct is not condoned by the Court.

### (3) Harmony Among Co-Workers and Close Working Relationships

Further, while the Court notes Plaintiff's speech certainly impaired "harmony among co-workers" at NJIT—as evidenced by the public petitions of NJIT and Rutgers professors in protest of Plaintiff's speech and continued employment—at the college level it is not necessary for Plaintiff to have a "close working relationship" with faculty and school administrators. *Munroe*, 805 F.3d at 476 (holding that high school teacher's relationship with school district, superintendent, and principal did not require personal loyalty or confidence); *see also Bauer v. Sampson*, 261 F.3d 775, 785 (9th Cir. 2001) ("[G]iven the nature of academic life, especially at the college level, it was not necessary that Bauer and the administration enjoy a close working relationship requiring trust and respect—indeed anyone who has spent time on college campuses knows that the vigorous exchange of ideas and resulting tension between an administration and its faculty is as much a part of college life as homecoming and final exams.").

### (4) Likelihood of Further Disruption to the Administration and Faculty

Plaintiff argues that the complaints the NJIT administration received regarding Plaintiff's speech "were all merely negative reactions to Jorjani's speech by other people, rather than disruptions by Jorjani himself." Pl.'s Mov. Br. 13. Further, he asserts that "to complain, as Bloom and Belfield have done, as though they were burdened by a genuine disruption when fielding complaints from vicious and intolerant people who wanted Jorjani fired on the basis of pure speech, is an exercise in infantilism" that "reveals a disgraceful lack of backbone." *Id.* (citations omitted). Plaintiff maintains that the "general rumblings against Jorjani's speech and even some classroom disruption would still not rise to the level of a 'substantial disruption' under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) and its progeny." *Id.* at 13-14 (citing *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 922-23, 931-32 (3d Cir. 2011)).

The authorities cited by Plaintiff in support of his assertions are unpersuasive. While *Tinker* and *J.S.* may elucidate general principles about the importance of free speech in academic settings, both cases relate to disruptions in public K-12 schools caused by student speech—rather than disruptions in university settings caused by professors or other government employees—and are thus not controlling in a *Pickering* context. *See Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 168 n.8 (3d Cir. 2008) (noting that *Tinker* did not alter the test that the Supreme Court established to evaluate the speech of a public employee in *Pickering*). Plaintiff also cites to *Trotman v. Bd. of Trustees of Lincoln Univ.*, 635 F.2d 216 (3d Cir. 1980) to argue that at the college level, a university must be willing to accommodate much greater disruption than the disruption alleged here before *Pickering* balancing would weigh in its favor. Pl.'s Mov. Br. 14-15. Plaintiff contends that the *Trotman* Court found that "years long disputes involving 'dismissal of a dissenting family member, disruption of classes, arrest of faculty members . . . , attempted stifling of

debate and other sorry incidents' including on-campus picketing by faculty (and off-campus picketing of both a university trustee and the university attorney)" was protected under the First Amendment. *Id.* at 15. While the *Trotman* Court held that this conduct was largely "'core' speech squarely encompassed within the First Amendment" while analyzing plaintiffs' prior restraint claim, the Court explicitly stated that it was referring to the embodiment of activity within the legal definition of "speech" as distinguished from "obscenity," which is not protected under the First Amendment. 635 F.2d at 225 & n.4. The *Trotman* Court further specified that "the 'protection' afforded by the First Amendment *even to expressions falling within its scope* can be diminished since [under *Pickering*,] consequences such as dismissal may flow under certain circumstances from the expression by public employees of what would ordinarily be fully protected speech." *Id.* (emphasis added). Indeed, when analyzing the plaintiffs' retaliation claim, the *Trotman* Court explicitly noted that the district court found the conduct at issue to be "disruptive" under *Pickering*, though it ultimately remanded the case so that the district court could apply the correct burden of proof on another ground. *Id.* at 230-31. Thus, the conduct at issue in *Trotman* does not serve as a minimum benchmark for disruption at the university level under *Pickering*.

While Defendants do not assert that any protests or demonstrations resulted from Plaintiff's speech, a government employer is not required "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick v. Myers*, 461 U.S. 138, 152 (1983); *see also Munroe*, 805 F.3d at 472 ("The government need not show the existence of actual disruption if it establishes that disruption is likely to occur because of the speech."). "[T]he Supreme Court has deferred heavily to employers' reasonable interpretations of employee speech and predictions of disruption[.]" *Fenico v. City of Philadelphia*, 70 F.4th 151, 168 (3d Cir. 2023) (noting that the Court has especially deferred to an employer's reasonable interpretation where the employer has performed an internal investigation into the matter) (citing *Waters v. Churchill*, 511 U.S. 661, 676 (1994)). Based on these principles, the Court finds that Defendants have made a sufficient showing that disruption to the administration and faculty of NJIT had occurred—and was likely to continue occurring—in response to Plaintiff's speech.

Within days of the publication of the NYT Op-Ed and Recording, Belfield testified that "multitudes of faculty, staff, and students" came to his door or called to complain. Belfield Dep. 192:7-13. Additionally, Defendants, along with other NJIT faculty and personnel, received approximately fifty communications from NJIT alumni, parents, and others both within and outside of the university expressing concern and outrage regarding Plaintiff's views. Pl.'s Resp. to Defs.' SMF ¶ 29; Defs.' Exs. 18-21; Deek Dep. 182:4-183:4; Bloom Dep. 131:2-11 ("[T]his is very disruptive to what we do here. We're a very thinly staffed organization. I've got all of these people, it looks like, from just all this last row of E-mails. We've got the department chair. We've got two or three faculty members. So, yeah, we're clearly – we're clearly being disrupted by this. Yeah. And a lot of people are offering all kind of stuff that this guy is involved in."); Stern Dep. 180:11-12 ("The

13

phones were ringing off the hook. Other activities were stopped."). Because of these complaints, Defendants sent the September 20, 2017 Email to faculty and staff stating that they would review the matter one day after the publication of the NYT Op-Ed and Recording. Belfield testified that he sent the message to quell the risk of further disruption. Belfield Dep. 192:10-13 ("[T]here was such disruption that I felt that there needed to be some message that was sent to try to bring a little sense of calm to those that were extraordinarily offended and upset by Jorjani[.]"); *see also* Pl.'s Ex. 42 (email from Science, Technology & Society Program Director Maurie Cohen to Humanities Department Chair Eric Katz on September 20, 2017, "Would it be possible to get any insight . . . into how this situation is being administratively handled? . . . [B]ased on the flow of incoming email messages it is starting to turn into a major embarrassment for the university and that concerns me greatly"); Defs.' Ex. 18 at NJITESI-000573 (email from Interim Dean Anthony Schuman to Deek and Bloom on September 21, 2017 forwarding a complaint from a parent and stating, "I appreciate the delicacy of the matter involving due process and free speech, but am wondering if you plan to issue any public statement in the near future").

The NJIT Administration had already diverted resources to address the unfolding situation, and the concentration of complaints it received over such a short time span suggests that it was reasonable to predict that further disruption was likely to occur. *See Hedgepeth v. Britton*, No. 21 CV 3790, 2024 WL 689959, at *2 n.4, *9 (N.D. Ill. Feb. 20, 2024) (noting that "the District was forced to divert resources from the normal operations of school services to address [plaintiff high school teacher's] posts" and finding 113 emails and 76 public comments in one month about plaintiff's speech relevant to *Pickering* balancing).

Further, the Court finds Plaintiff's argument that Bloom, Belfield, and the rest of the NJIT administration "fostered the disruption" similarly unavailing. Pl.'s Mov. Br. 16-20. No language in the September 20, 2017 Email, which was sent only to faculty and staff, "signaled" others to "attack" Jorjani. And, contrary to Plaintiff's assertion, the record does not reflect a situation comparable to *Czurlanis v. Albanese*, 721 F.2d 98, 107 (3d Cir. 1983), where the court discredited disruption caused by several petitions and letters signed by the plaintiff's co-workers because the plaintiff's supervisor solicited the letters and had "instigated" at least one of the petitions. While the faculty statements against Jorjani in *The Vector* were sent to Bloom, Belfield, and other administrators before they were published, the authors did not seek approval from the administration before they were published. Other than acknowledging receipt, the only advice given was by NJIT's Chief Strategy Officer, who opined that signatories should sign their respective statements individually so that they "would not be misinterpreted as a university statement." Pl.'s Ex. 40 at NJITESI-005161. There is no suggestion that Bloom or Belfield otherwise had any involvement in the creation of the faculty statements.[9]

---

[9] Plaintiff argues that Defendants engaged in viewpoint discrimination because Bloom and Belfield testified that they personally disagreed with Plaintiff's viewpoints, and because Belfield stated that he was not aware of anyone at NJIT

14

### (5) Disruption to NJIT's Institutional Mission and Plaintiff's Ability to Perform His Teaching Duties

In addition to disrupting NJIT's administration and faculty, the Court finds that Plaintiff's speech interfered with NJIT's institutional mission of providing the public with a hostile-free educational environment and hindered Plaintiff's ability to perform his teaching duties.

"Academic freedom prevents 'a pall of orthodoxy over the classroom' [and] fosters 'that robust exchange of ideas which discovers truth.'" *Kunda v. Muhlenberg Coll.*, 621 F.2d 532, 547 (3d Cir. 1980) (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)). Thus, "in cases dealing with academia, the standard applied in evaluating the employer's justification should be the one applicable to the rights of teachers and students 'in light of the special characteristics of the school environment[.]'" *Trotman*, 635 F.2d at 230 (quoting *Tinker*, 393 U.S. at 506). Plaintiff asserts that because universities do not assume the same "custodial and tutelary" role of K-12 public schools, NJIT has "no countervailing interest whatsoever in sparing delicate ears from the burden of confronting ideas they find alarming." Pl.'s Mov. Br. 14-15.

While "public universities are intended to function as marketplaces of ideas" and have pedagogical and custodial goals that differ from K-12 public schools, *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243-44 (3d Cir. 2010), schools at the university level still maintain a well-recognized interest in "fostering a collegial educational environment." *Gruber v. Tennessee Tech Bd. of Trustees*, No. 22-6106, 2024 WL 3051196, at *3 (6th Cir. May 16, 2024) (quoting *Trejo v. Shoben*, 319 F.3d 878, 888 (7th Cir. 2003) ("[A] university has an interest in fostering a collegial educational environment while doing everything within its power to maintain its reputation in the academic community both on campus and around the nation."); *accord Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001) ("[C]olleges and universities are legally required to maintain a hostile-free learning environment and must strive to create policies which serve that purpose."). Thus, even though "a professor's rights to academic freedom and freedom of expression are paramount in the academic setting, they are not absolute to the point of compromising a student's right to learn in a hostile-free environment." *Bonnell*, 241 F.3d at 823-24.

In the NYT Op-Ed and Recording, Plaintiff is first shown speaking at a conference calling "universal human rights" an "ill-conceived and bankrupt" socio-political ideology. Singal, *supra* at Section I.A. Plaintiff is then shown in the midst of his conversation with

---

who approved of Plaintiff's speech and political associations. *See, e.g.*, Pl.'s Mov. Br. 8. The fact that the individual defendants—and others at NJIT—personally disapproved of Plaintiff's speech does not conclusively give rise to viewpoint discrimination, which is notably not a cause of action alleged in this case. Further, the individual defendants' personal beliefs "do[] not diminish the evidence in the record that external complaints about [Plaintiff's] speech amounted to significant disruption." *Hedgepeth*, 2024 WL 689959, at *10.

Hellberg, where he is discussing the disintegration of the present order and the need to create a "revolutionary state" before stating that "it's going to end" with the expulsion of migrants and citizens who are primarily of Muslim descent, concentration camps, and war "at the cost of a few hundred million people." *Id.* Plaintiff then continues, "We will have a Europe, in 2050 where the banknotes have Adolf Hitler, Napolean Bonaparte, Alexander the Great. And Hitler will be seen like that: like Napolean, like Alexander; not like some weird monster, who is unique in his own category. No, he's just going to be seen as a great European leader." Pl.'s Resp. to Defs.' SMF ¶ 8.

A professor that calls universal human rights "ill-conceived and bankrupt" and predicts that Muslims will be expelled and put in concentration camps while Hitler is praised as a "great European leader"—regardless of the exact context of these statements—certainly presents a level of hostility that is likely to disrupt NJIT's mission of fostering a collegial pedagogical environment.[10] *See Waters v. Churchill*, 511 U.S. 661, 676-77 (plurality opinion) (looking to government employer's reasonable understanding of speech at issue, even where employer's understanding is inaccurate). The complaints sent to NJIT following the publication of the NYT Op-Ed and Recording reflect a concern about NJIT's ability to pursue its mission of providing a collegial educational environment to its diverse student population with Plaintiff on the faculty. *See* Defs.' Ex. 18 at NJITESI-004675 ("[Plaintiff's] public statements and his other employment are in direct conflict with the university's principles, and he is teaching humanities and philosophy."); Defs.' Ex. 19 at NJITESI-000573 ("It is deeply troubling to find someone with such heinous views in a school of young people, especially NJIT which embraces people of all nationalities and races. His views are not just a political viewpoint, he clearly states his belief in the principles and actions of Hitler, advocating genocide of Jews and Muslims."); Defs.' Ex. 21 at NJITESI-000575 ("As an NJIT alumni and a member of at least one group of human beings people like Mr. Jorjani would see gassed, I am horrified and embarrassed by my alma mater's association with him. The views he espouses are diametrically opposed to the diverse environment NJIT has become in the years since I have been there. I urge you to cut ties with him as quickly as possible. He is a stain on our university's marvelous reputation.").

The record also shows that NJIT students were impacted by Plaintiff's speech. Plaintiff is quoted in an interview with *The Star-Ledger*, a New Jersey newspaper, stating that "I like teaching and I had a great rapport with my students. . . . The worst thing in this entire episode has been the huge change in attitude toward me on the part of my students." Defs.' Ex. 12 (omission in original). The news article further quotes Plaintiff stating that during one of his classes after the NYT Op-Ed was published, "it looked like the students had been gut-punched. It was awful." *Id.* Additionally, Defendants testified that they

---

[10] To the extent Plaintiff argues that the NYT Recording was edited to misconstrue his statements, Pl.'s Opp. Br. 3-4, it is clear to this Court that minutes later in the unedited recording of the conversation, Plaintiff states that he himself *wanted* a Europe that featured Hitler on a banknote. Pl.'s Ex. 1 at 1:43:27 (emphasis added).

received complaints from students. *See* Bloom Dep. 172:2-5 ("The form of the disruption was students first. There are a number of them that saw or read or observed the *New York Times* article."); Belfield Dep. 182:10-13 ("Students were complaining about it. Faculty were complaining about it. Staff were complaining about it. It was -- those type of comments and views are . . . not part of a university community."); 193:6-7 (disruption took the form of "[a]ngry phone calls, angry visits to my office. Students being very concerned."); 195:16-25 (disruption included disruption to the "students['] ability to learn because they were upset").

Further, circuit courts have recognized the interest of government employers—including universities—in preventing "disrespectful, demeaning, rude, and insulting" employee speech. *See Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1288 (11th Cir. 2006); *see also Gruber v. Tennessee Tech Bd. of Trustees*, No. 22-6106, 2024 WL 3051196, at *3 (6th Cir. May 16, 2024). Plaintiff's post on AltRight.com entitled "Against Perennial Philosophy" fails to uphold NJIT's interest in providing a non-denigrating environment and "erode[s] the necessary trust and respect between [Plaintiff] and [his] students." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 474 (3d Cir. 2015). In support of his unsupported statement that only Aryan people have the genetic ability for top-level philosophic thought, Plaintiff explains that African people have a lower average IQ than white people not due to "education or social conditioning, but [due to] different genetic inheritances from extinct Hominid species."[11] Defs.' Ex. 7 at 9. A page later, Plaintiff advocates for the use of "embryo selection and genetic engineering" to "restore the pre-Arab and pre-Mongol genetic character of the majority of the Iranian population within only one or two generations" to potentially "Make Iran Great Again." *Id.* at 10.

Defendants testified that there was a reasonable concern that, particularly due to NJIT's diverse student body, Plaintiff's speech flatly demeaned the intelligence of his students by stating that a person's ability to succeed as a philosophical thinker—*i.e.*, succeed in the very subject Plaintiff was hired to teach—is pre-determined based on the person's race and background. *See* Deek Dep. 74:3-11. ("[It] [c]oncerned me that we have these students, precisely the students that Dr. Jorjani is talking about. He is teaching them. He's going to walk into that classroom. He's going to see the Africans, he's going to see the Ar[y]ans, he's going to meet—he's going to see the people in between. He's going to

---

[11] The Court takes notice of Plaintiff's repeated citations to the Brief for Appellants submitted by Thurgood Marshall, *et al.*, in *Brown v. Board of Education*, 349 U.S. 294 (1955). *See* Pl.'s Mov. Br. 22; Pl.'s Opp. Br. 8; Pl.'s Reply Br. 4. Plaintiff invokes the scientific report appended to the brief in support of his assertion that "Thurgood Marshall and Plaintiff Jorjani are in accord [that] there are in fact measurable differences in IQ between whites and blacks." Pl.'s Opp. Br. 8. The Court finds that Plaintiff's arguments grossly mischaracterize the report's findings in a misguided attempt to provide legitimacy to Plaintiff's speech in "Against Perennial Philosophy." Additionally, the cited report concludes "that segregation, prejudices and discriminations, and their social concomitants potentially damage the personality of all children—the children of the majority group in a somewhat different way than the more obviously damaged children of the minority group." Appendix to Brief for Appellants at *4, *12, *Brown v. Board of Education*, 1952 WL 47265 (1952). Thus, the report further supports the notion that prejudice disrupts an educational institution's ability to provide an effective educational environment.

be grading their work. Yes. Absolutely. It did . . . concern me."); Bloom Dep. 56:1-4 ("We have a context of [a] university that is extremely diverse. We do not put students in the classroom to be denigrated, be insulted by extremes[.]"); Belfield Dep. 13:3-4 ("[O]ur primary mission is to educate students."). While Plaintiff argues that his speech did not refer to anyone at NJIT, Plaintiff's Opp. Br. 3, 5, his speech attacks wide swaths of people that necessarily include individuals within NJIT's student body. *See Munroe*, 805 F.3d at 474 ("[I]nvective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations."); *see also Rankin v. McPherson*, 483 U.S. 378, 390-91 (1987) (noting that the "burden of caution employees bear with respect to the words they speak" will vary in part based on the extent of authority, public accountability, and public contact their role entails); *cf. Pickering v. Bd. of Ed.*, 391 U.S. 563, 569-70 (1968) (considering that the appellant teacher's statements were "in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher").

Plaintiff refutes the proposition that students were negatively impacted by his speech by citing to an email that one of his students sent to Eric Katz, Chair of NJIT's Humanities Department, on September 26, 2017. *See, e.g.*, Pl.'s Mov. Br. at 2; Pl.'s Opp. Br. at 11. In the email, the student writes in support of Plaintiff, and, purporting to speak for the opinions of other unnamed students in Plaintiff's classes, states that they "collectively feel that an injustice is being carried out against [their] professor." Pl.'s Ex. 48. The student writes in part about the positive impact that Plaintiff has had on his studies and maintains that based on how Plaintiff explains concepts in class, the NYT Op-Ed and Recording took his speech out of context. *Id.* Plaintiff also notes that Defendants Belfield and Deek testified that they believed that Plaintiff was popular with a number of his students. Belfield Dep. 252:19-22; Deek Dep. 170:6-7. However, one student's email in support of Plaintiff, along with the general proposition that some students did in fact like his classes, does not negate the disruption that his speech nonetheless caused. *See Hedgepeth v. Britton*, No. 21 CV 3790, 2024 WL 689959, at *2 n.4 (N.D. Ill. Feb. 20, 2024). It was reasonable to believe that, had Plaintiff continued to teach, he would have caused far greater disruption as additional students registered for his classes. *See Gruber*, 2024 WL 3051196, at *3 ("[E]vidence of widespread destruction is not necessary: it was reasonable for [the university's Provost and Vice President] to believe that, had the flyers remained posted, they could have caused far greater disruption.").

Contrary to his assertions, Plaintiff's speech did not merely cause offense—it disrupted (and was likely to further disrupt) NJIT's administration, interfered with NJIT's mission to efficiently provide a hostile-free learning environment for its students, and impeded Plaintiff's ability to effectively perform his teaching duties. *See Reges v. Cauce*, No. 2:22-CV-00964, 2024 WL 2140888, at *24 (W.D. Wash. May 8, 2024) ("While offense alone does not amount to a legitimate interest to justify limiting speech, mitigating interference with students' studies and ability to learn can be such an interest."). Weighing

the parties' interests pursuant to the *Pickering* balancing test, the Court finds that Defendants' interest in mitigating the disruption caused by Plaintiff's speech in the NYT Op-Ed and Recording as well as his online post entitled *Against Perennial Philosophy* sufficiently outweighs Plaintiff's interest in its expression. Thus, Plaintiff's speech does not merit protection under the First Amendment, and Defendants did not violate Plaintiff's constitutional rights.

In light of this finding, the Court does not reach the remaining two elements of a First Amendment Retaliation claim, namely whether Plaintiff's speech was a substantial or motivating factor in the alleged retaliatory actions against him and whether Plaintiff would have been terminated even if his speech had not occurred. The parties' remaining arguments, including those relating to qualified immunity and damages, also need not be addressed.

## V.    CONCLUSION

For the reasons set forth above, Plaintiff's motion, ECF No. 118, is **DENIED** and Defendants' motion, ECF No. 180, is **GRANTED**. An appropriate Order shall follow.

WILLIAM J. MARTINI, U.S.D.J.

Date: July 27, 2024