UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------X

JASON JORJANI,
                Plaintiff,

-vs-

NEW JERSEY INSTITUTE OF TECHNOLOGY
et al.,
                Defendants.
-----------------------------------------------------------X

Civil Action No. 18-cv-11693

# PLAINTIFF'S RENEWED MOTION IN SUPPORT OF SUMMARY JUDGMENT ON LIABILITY AS TO DEFENDANTS BLOOM AND BELFIELD

Dated: Goshen, New York
       December 22, 2025

| | |
|---|---|
| /s/Frederick C. Kelly | /s/ Patrick Trainor |
| Frederick C. Kelly, Esq. | Law Office of Patrick Trainor, Esq., LLC |
| *Attorney for Plaintiff* | *Local Counsel for Plaintiff* |
| One Harriman Square | 19 Union Avenue, Suite 201 |
| Goshen, NY 10924 | Rutherford, New Jersey 07070 |
| (845) 294-7945 | (201) 777-3327 |
| *Pro Hac Vice* | |

This memorandum is submitted pursuant to the court's text order at *DKT. 201*. Plaintiff Jason Jorjani renews his motion for summary judgment on liability as to Defendants President Joel S. Bloom and Dean Kevin Belfield for their Mass Email of September 20, 2017 and the suspension of Plaintiff on September 25, 2017. Damages and attorney fees, liability for Jorjani's later non-renewal, and liability as to the other Defendants, are all issues reserved for another day.

## INTRODUCTION AND BACKGROUND

On September 8, 2025, the Third Circuit handed down a precedential, unanimous decision finding Jorjani's speech to be fully protected. *Jorjani v. N.J. Inst. of Tech.*, 151 F.4th 135 (3rd Cir. 2025); *DKT. 188*. The Third Circuit concluded that "the disruption NJIT described does not outweigh even minimal interest in Jorjani's speech" (*DKT. 188, p. 15*), while noting that Jorjani's interest was ample, *viz.*, "All amply showing that interest in Jorjani's speeches, writings, and discussions carries some significance to balance." *Id., p. 11*.

## ARGUMENT

When evaluating claims of First Amendment retaliation courts in the Third Circuit apply the following "straightforward" criteria. *Holder v. City of Allentown,* 987 F.2d 188, 194 (3rd Cir 1993).

1. First, the employee must show that the activity is in fact protected.
2. Second, the employee must show that the protected activity was a substantial factor in the alleged retaliatory action.
3. Third, the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct.

*Holder v. City of Allentown, supra.; see also, Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) and *Czurlanis v. Albanese*, 721 F.2d 98, 103 (3rd Cir. 1983).

The Third Circuit has now definitively put to rest the first element: Jorjani's speech was amply protected. That leaves only the second and third elements.

**I:   THE MASS MAIL OF SEPTEMBER 20th AND THE SUSPENSION OF SEPTEMBER 25th ARE BOTH INSTANCES OF ADVERSE EMPLOYMENT ACTIONS OFFENSIVE TO THE FIRST AMENDMENT.**

The rule is that a "public employer 'adversely affects an employee's First Amendment rights... when it makes decisions, which relate to promotion, transfer, recall and hiring, based on the exercise of an employee's First Amendment rights.'" *Brennan v. Norton*, 350 F.3d 399, 419 (ED PA, 2003), *quoting Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). The Third Circuit provides this further gloss:

> Although the nature of the retaliatory acts... must "be more than de minimis," amounting to more than "criticism, false accusations, or verbal reprimands," the threshold is "very low." Indeed, we have observed that "an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her" First Amendment right may suffice.
> *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 758 (2019) (quotations and citations omitted)

The critical question is "whether the challenged conduct would, objectively, chill or deter the exercise of constitutionally protected speech." *Bell v. Sheriff of Broward Cnty* 6 F.4th 1374, 1379 (11th Cir. 2021).

There can be no genuine dispute that Jorjani's suspension on September 25th was an adverse employment action. In the first place, it was part and parcel of the reprisals (including the publicly announced investigation and the later non-renewal) Defendants visited on Jorjani

because of his amply protected speech.

Second, after learning of Jorjani's suspension, the American Association of University Professors ("AAUP") sent a letter of protest addressed to President Bloom[1] on October 9, 2017, stating:

> The AAUP regards an action to separate a faculty member from ongoing academic responsibilities, whether with pay or without, to be a suspension. It further regards suspensions to be severely adverse personnel actions because of what they imply about the faculty member's professional fitness and because of the potential effect on the faculty member's reputation...
> *DE. 120 at ¶23 and Exhibit A thereto at DE. 120-1.*

NJIT's highest ranking academic officer agreed.  At deposition, Provost Deek acknowledged that the AAUP was authoritative, that it formulated policy on academic freedom that many institutions considered normative, and that NJIT itself attempted to follow the standards for free speech developed by the AAUP.  *DE 119-10 at pp. 162-164.*  Furthermore, he agreed that the AAUP was correct in holding Jorjani's suspension to be a "severely adverse personnel action" that "reflected negatively" on Jorjani's "professional fitness."  *Id. pp. 165-166.*

This was not "paid administrative leave without more" and it was surely not the routine workings of the system.  Defendants Bloom and Belfield did not merely send the Mass Email, and they did not merely suspend Jorjani.  They sent Mass Email to all faculty before hearing anything from Jorjani in his own defense (*DKT. 184-1, ¶¶79-82*), publicly announced that Jorjani was under investigation for what was in effect pure speech which should have been fully protected (*DKT. 184-1, ¶80*), publicly assured various outside agitators that they were acting against Jorjani because of his fully protected speech (*DKT. 184-1, ¶37 cf. ¶¶21, 28, 48, and 49*),

---

[1] The AAUP letter was also copied to Defendants Deek and Belfield, who have acknowledged receipt. *DE. 119-17*, pp. 205-06 and *DE. 119-10*, pp. 163-165.

warmly collaborated with at least one outside agitator who had been campaigning to have Jorjani fired for almost a year because of his protected speech (*DKT. 184-1, ¶37*), suspended Jorjani (*DKT. 184-1, ¶95*), falsely indicated that his suspension was partly the result of OAQ violations that caused "disruption"(*DKT. 184-1, ¶¶118, 125-126*), communicated Jorjani's suspension to the faculty (*DKT. 184-1, ¶123*), communicated his suspension to his students – who objected at the flagrant First Amendment violation and worried about the danger to free speech inherent in Defendants' actions (*DKT. 184-1, ¶¶6, 122*), told the President of the Faculty Senate that Jorjani was being charged with "hate speech" and would soon be fired for said "hate speech"(*DKT. 184-1, ¶124*), quietly encouraged various other faculty members to issue various attacks on Jorjani in the school newspaper (*DKT. 184-1, ¶¶134-135*), and stuck to their course of action despite being reprimanded by the AAUP.  *DKT. 184-1, ¶¶140-144*.  Moreover, all of the above was preceded by a lengthy spying project and was capped off by terminating Jorjani, rather than returning him unimpaired to his teaching duties.

It would be astonishing if the above did not deter even a remarkably stalwart person in the exercise of his free speech rights, let alone discourage the average person.

In addition, even before the suspension of September 25th, the Mass Email of September 20th was, in itself, an adverse employment action.  The Mass Email threatened Jorjani with sanctions before the rest of the faculty for nothing more than fully protected speech ("We presently are conducting a review of this matter and will provide additional information as soon as that review is complete" *RE. 119-15*), sanctions which were sharpened five days later when he was suspended.

The Third Circuit was presented with a similar situation by involving Lincoln University

- 4 -

in *Trotman v. Board of Trustees*, 635 F.2d 216 (3rd Cir. 1980). The judges did not hesitate to conclude they were confronting an adverse action:

> The district court viewed some of Dr. Branson's letters as "no more than the exercise by Branson of the same right which plaintiffs purport to defend." If those letters merely constituted a defense by Branson of his position on retrenchment or other matters of public concern, or his rebuttal to plaintiffs' criticism, then they would indeed be entitled to the same protection. *However, the district court overlooked the fact that those letters contained language sometimes explicitly and other times implicitly threatening discipline up to dismissal if plaintiffs continued to engage in speech or other protected activity such as picketing*. They therefore do not stand on the same level as letters written by adherents of opposing viewpoints on an internal dispute. *They were written by a state official in a position of authority with the power to impose discipline*. They are therefore state action which must be exercised in compliance with the mandate of the First Amendment and cannot be dismissed as merely part of an academic debate.
> *Id.* at 228 – emphasis supplied.

State action is not "exercised in compliance with the mandate of the First Amendment" when it is undertaken to placate the people seeking to silence a dissident voice, and when it indicates sanctions for protected speech, which is how the Mass Email originated and what it did. *DE. 119-19; DE 119-20; DE. 119-21 and DE-119-14.* Notably, at deposition Dean Belfield was quite explicit about his intention to placate Jorjani's critics. He issued the Mass Email because he understood that people were complaining about the content and viewpoint of Jorjani's speech and he, too, disagreed with that content and viewpoint. *DE. 119-17 at pp. 182 and 185.*

Furthermore, both Bloom and Belfield are personally liable for the Mass Email of September 20th and the Suspension of September 25th. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3rd Cir. 2015). *DE. 119-17 at pp. 174–177 and 207–209; DE. 119-22, Bloom Interrogatory Responses sworn October 17, 2019 at Nos. 4 and 5; and DE. 119- 23, NJIT Interrogatory Responses sworn October 15, 2019; and DE. 119-24, Supplemental Interrogatory*

*Responses sworn November 26, 2019.*

### II: WHERE THE ADVERSE ACTION IS A DIRECT RESULT OF THE PROTECTED SPEECH, THE LAST TWO STEPS OF THE RETALIATION ANALYSIS ARE CONCEDED.

Usually, to meet the second prong of the retaliation test it is necessary to show that the speech was "a substantial or motivating factor" in the decision to take adverse action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The burden would then shift back to the defendants to show "that the same adverse action would have taken place in the absence of the protected conduct." *Hill v. City of Scranton*, *supra.*; *Czurlanis v. Albanese* at 103.

In this case, it is clear that both the Mass Email of September 20th and the Suspension of September 25th were substantially motivated by Jorjani's fully protected speech, for they both specifically cited to that speech. *DE. 119-15 and DE. 119-18.* And there is no evidence that either the Mass Email or the Suspension would have been effected but for the speech, meaning that the NJIT Defendants cannot raise a defense under the third prong. *DE 119-17 pp. 203, 204-205.* Thus, even under the usual scenario, Jorjani would be entitled to summary judgment.

But in this case, it is even simpler, at least as far as the suspension goes.

Here the evidence shows that Jorjani's suspension was solely and directly the result of protected speech. Provost Deek's deposition testimony revealed that protected speech was the sole reason for the alleged "disruption." *DE. 119-10, pp. 47-48, 66-68.* Such being the case, there is no need to conduct the next two prongs of the retaliatory test. As stated by the Third Circuit in *Czurlanis v. Albanese*, *supra.*, where defendants concede that the suspension is the direct result of speech "we need not dwell on the latter two steps" *Id.* at 103.

**III:     PUNITIVE LIABILITY AGAINST BLOOM AND BELFIELD IS ENTIRELY WARRANTED.**

"Punitive damages are appropriate in § 1983 actions when a 'defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Carroll v. Clifford Twp*., 625 Fed. Appx. 43, 46 (3rd Cir. 2015), *quoting Alexander v. Riga*, 208 F.3d 419, 430-31 (3rd Cir. 2000). "'Malice' and 'reckless indifference,' in this context, however," need not refer to egregious conduct, but rather to "knowledge that" the defendants "may be acting in violation of federal law." *Alexander v. Riga* at 431.  We need not wait for an explicit admission, for "recklessness and malice may be inferred." *Id.*

Here we have viewpoint discrimination (*DE. 119-17, pp. 170, 179-181, 182, 184-185, 188-189, 243-244; see also*, *DE 119-11*), which is already among the most egregious of First Amendment violations. *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) and *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).  The fact that such an egregious violation occurred within an institution which is "peculiarly the 'marketplace of ideas'" (*Keyishian*, 385 U.S. 589, 603 (1967)) is clearly an aggravating factor.

What is more, we have a "spying project"(*Adler v. Board of Ed* at 509 (J. Douglas, *dissenting*)) undertaken at a state university.  Beginning in November of 2016, the NJIT administration (including Bloom and Belfield) put Jorjani under secret review because of the content and viewpoint of what should have been fully protected extra-mural speech.  *DE. 119-17, pp. 57-58,* 90, 98-99; *see also, Exhibit DE. 119-44.*  The concern was with Jorjani's "personal beliefs and extra-mural" speech, which both Bloom and Belfield understood was beyond the

purview of the hierarchy at NJIT (*DE 119- 26, p. 23 and DE. 119-17, p. 35*) and which the Third Circuit has now robustly confirmed was amply protected .

Indeed, when asked if it was the content of Jorjani's speech which caused NJIT concern, Dean Belfield blithely answered, "I assume so." *DE. 119-17, pp. 85-86.*

The purpose of this spying project was not to defend Jorjani's right to extra-mural speech because that never happened. *DE 119- 26, p. 90; DE. 119-10, pp. 177-182; and DE. 119-9, pp. 50-52.* Instead, President Bloom's administration, from early on, settled on a policy of issuing statements which attempted to placate the outside agitators by signaling NJIT's disapproval of Jorjani's speech. *DE. 119-26, pp. 103, 119– 120, 125; and DE 119-45 and DE. 119-10, pp. 124-125.*

And no one in the hierarchy (or any where else at NJIT) even alerted Jorjani to the fact that people were complaining about him, let alone re-assured him that his rights to free speech would be secured. *DE. 120 at ¶¶29-30 and De. 119-9, pp. 77-78.*

Nor was the purpose of this clandestine review to engage Jorjani in a civil exchange of ideas, something which also never happened; and which no one among the hierarchy at NJIT ever attempted to encourage, either before or after the NYT Op-Ed. *DE. 120 ¶31; and DE 119-26, p. 127; DE. 119-10, p. 126; and DE. 119-17, pp. 90. 196-198.*

NJIT regularly received reports about Jorjani's fully protected speech from "inside stakeholders" and "inside people" such as Assistant Dean Eric Hetherington on December 5, 2016 (*DE. 119-36 and DE. 119-17, pp. 36-37*); or Jorjani's own Chairman, Professor Katz on May 30, 2017 (*DE. 119-32 and DE. 119-43, entry no. 85*); or Katz's successor, future Chairman of the Humanities Department Maurie Cohen on December 16, 2016 (*DE 119-35 and DE. 119-9,*

*p. 65.),* or future Chairman Cohen again on March 13, 2017. *DE. 119-34 and de 119-44, entry no. 51.*

Furthermore, both Bloom and Belfield understood that their actions were unlawful. Despite throwing Jorjani to the baying crowd that gathered in the wake of the NYT Op-Ed – that is, right when NJIT began to feel acute pressure over Jorjani's extra-mural speech (*DE. 119-17, p. 239*) and when Jorjani obviously would have most needed a stronghold for free speech – both Bloom and Belfield have clearly articulated that they knew that extra-mural speech merited protection under the First Amendment. *DE. 119-26, p. 23 and DE 119-17, p. 35 and DE. 119-36.*

In this regard, Belfield's incredible retrenchment elsewhere in his deposition, where he directly contradicted well settled precedent such as *Keyishian v. Board of Regents* (*DE. 119-17, pp. 30-31*), and denied that safeguarding academic freedom was any part of his job (*Id., pp. 23-24*), can only be taken by any reasonable fact finder as a brazen attempt to deliberately violate the First Amendment. *Id., pp. 18, 23-24, 32-34, 78, 150-151, 170-171, 179, 180-181, 182, 196, 243-244.*

Indeed, were it true that Belfield, who has spent nearly three decades in the academy (*Id., p. 10*) had no concerns about protecting unpopular speech with regard to Jorjani in September of 2017, and that he really hadn't thought about that lack of concern since (*Id. p. 170-171*), punitive damages would be all the more compelling because "deterrence of future egregious conduct" is a primary purpose of punitive damages. *Smith v. Wade*, 461 U.S. 30, 49 (1983).

\*\*\*

Summary judgment should be granted only when there is "no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Nevertheless, there must be a "genuine dispute" to forestall a motion for summary judgment and a "dispute over an issue is 'genuine' only if a reasonable jury could find in the non-movant's favor on that issue...." *Chavarriaga v. N.J. Dep't of Corr.* at 218; *see also, Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3rd Cir. 2009) (asserting that specific facts must be submitted showing "genuine issues of fact" in dispute).

Here, Jorjani respectfully submits that no reasonable fact-finder could fail to return a verdict in his favor as to liability for the Mass Email and Suspension.

Dated: Goshen, New York
December 22, 2025

Yours, etc.

/s/Frederick C. Kelly
Frederick C. Kelly, Esq.
*Attorney for Plaintiff*
One Harriman Square
Goshen, NY 10924
(845) 294-7945
*Pro Hac Vice*


/s/ Patrick Trainor
Law Office of Patrick Trainor, Esq., LLC
*Local Counsel for Plaintiff*
19 Union Avenue, Suite 201
Rutherford, New Jersey 07070
(201) 777-3327